# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**RON TSUR**,

          Plaintiff,

v.

**INTEL CORPORATION**,

          Defendant.

Case No. 3:21-cv-655-SI

**OPINION AND ORDER**

Shanti S. Lewallen, LEWALLEN LAW LLC, 65 SW Yamhill Street, Suite 300, Portland, OR 97204. Of Attorneys for Plaintiff Ron Tsur.

Helen M. McFarland, SEYFARTH SHAW LLP, 999 Third Avenue, Suite 4700, Seattle, WA 98104; Christopher DeGroff, SEYFARTH SHAW LLP, 233 S. Wacker Drive, Suite 8000, Chicago, IL 60606;and Sharde Skahan, SEYFARTH SHAW LLP, 2029 Century Park East, Suite 3500, Los Angeles CA 90067. Of Attorneys for Defendant Intel Corporation.

**Michael H. Simon, District Judge.**

Plaintiff Ron Tsur (Tsur) brings this lawsuit against his former employer, Defendant Intel Corporaton (Intel). Tsur alleges that Intel unlawfully discriminated and retaliated against him because of his age and Israeli national origin. Tsur began working at Intel as a full-time employee in 2011 at the age of 58. His first supervisor, Bruce Jones (Jones), allegedly made a series of demeaning comments to Tsur related to his age and Israeli national origin. Tsur reported Jones's age-related comments to the vice president of his department and believes that Jones

learned of that report and then retaliated against Tsur with a series of poor performance reviews, culminating in Intel giving Tsur a choice between leaving Intel or accepting a "Corrective Action Plan." Tsur chose to take the Corrective Action Plan, transferred departments, and received "Successful" performance reviews from new supervisors. In June 2015, however, Intel designated Tsur to be among a group of 1,155 employees selected for layoff, in part because of the poor performance reviews that Tsur had received from Jones.

In this lawsuit, Tsur asserts federal claims under the Age Discrimination in Employment Act (ADEA) and Title VII of the Civil Rights Act (Title VII) and state law claims under Oregon's anti-discrimination statutes.[1] Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, Intel moves to dismiss several of Tsur's claims and portions of his other claims. Among other things, Intel argues that the applicable statutes of limitation bar portions of Tsur's claims and also contends Tsur has failed to state a prima facie case of discrimination. Finally, Intel moves to strike many of Tsur's allegations under Rule 12(f).

## STANDARDS

### A.  Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, a court must accept as true all well-pleaded material facts alleged in a complaint and construe them in the light most favorable to the non-moving party. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629

---

[1] Or. Rev. Stat. §§ 659A.030, 659A.199.

F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). A court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). A court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

**B. Motion to Strike**

Under Rule 12(f) of the Federal Rules of Procedure, a court may strike from any pleading any matter that is "immaterial" or "impertinent," among other things. Something is "immaterial" if it "has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) (quoting C. Wright, A. Miller, et al., 5C Fed. Prac. & Proc. Civ. § 1382 (3d ed. 2013)). Something is "impertinent" if it does "not pertain, and [is] not necessary,

to the issues in question." *Id.* Such material is legally insufficient "under any set of facts the defendant might allege." *Polk v. Legal Recovery Law Offices*, 291 F.R.D. 485, 489 (S.D. Cal. 2013) (citation and quotation marks omitted).

The purpose of a Rule 12(f) motion is to avoid spending time and money litigating spurious issues. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010); *see also Fantasy, Inc.*, 984 F.2d at 1527. The disposition of a motion to strike is within the discretion of the district court. *See Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990). "Motions to strike are disfavored and infrequently granted." *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187, 1189 (D. Or. 2008); *see also Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 858 (N.D. Cal. 2014) ("Motions to strike are regarded with disfavor because of the limited importance of pleadings in federal practice and because they are often used solely to delay proceedings." (quotation marks and alterations omitted)).

## C.  Statutes of Limitation

Before suing for discrimination under the ADEA or Title VII, a plaintiff must first have filed a charge with the Equal Employment Opportunity Commission (EEOC) within 300 days after the alleged unlawful conduct. 29 U.S.C. § 626(d)(1); 42 U.S.C. § 2000e-5(e)(1). Courts treat this time-to-file requirement as a statute of limitations. *Sosa v. Hiraoka*, 920 F.2d 1451, 1455 (9th Cir. 1990) (Title VII); *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 674-75 (9th Cir. 1988) (ADEA).

Until September 2019, Oregon's employment discrimination statutes similarly required that a plaintiff file a charge with the Oregon Bureau of Labor and Industries (BOLI) within one year after the alleged unlawful conduct before that person may bring a civil action under these laws. Or. Rev. Stat. § 659A.875 (amended 2019). The Oregon Legislature, however, extended

that limitations period to five years for age and national origin discrimination claims, among other claims. Or. Rev. Stat. § 659A.875 (2019); Or. Laws 2019, ch. 343, § 6. The 2019 amendment did not alter the one-year limitations period for employment retaliation claims under Oregon Revised Statutes § 659A.199. Because Tsur filed his BOLI charge on January 12, 2016, before the new time-to-file requirements went into effect, Oregon's one-year statute of limitations applies in this case.

As noted, Tsur filed his BOLI charge on January 12, 2016. The date that Tsur filed his BOLI charge also serves as date he filed his EEOC charge. *See Stiefel v. Bechtel Corp.*, 624 F.3d 1240, 1245 (9th Cir. 2010) (stating that a workshare agreement between the EEOC and an equivalent state agency disposes of a plaintiff's need to file a separate charge with the EEOC in addition to a charge with the state agency); *Pearson v. Reynolds Sch. Dist. No. 7*, 998 F. Supp. 2d 1004, 1019 (D. Or. 2014) (stating that BOLI and the EEOC have a workshare agreement). Thus, the limitations period begins on March 18, 2015 for Tsur's ADEA and Title VII claims (300 days before the filing of his BOLI charge) and on January 12, 2015 (one year before the filing of his BOLI charge) for his state law claims.

**D.  Continuing Violations Doctrine**

The "continuing violations" doctrine allows a civil rights plaintiff to bring a claim based on events that occurred outside the applicable statute of limitations period if the plaintiff can show that the defendant engaged in a continuing violation that at least in part fell within the limitations period. *See Cherosky v. Henderson*, 330 F.3d 1243, 1246 n.3 (9th Cir. 2003) (noting that the continuing violations doctrine applies to Title VII and "other civil rights laws"). In 2002, the Supreme Court in *National Railroad Passenger Corp. v. Morgan* curtailed the continuing violations doctrine. 536 U.S. 101, 105 (2002). Before *Morgan*, the Ninth Circuit recognized continuing violations so long as a plaintiff alleged that a defendant either (1) engaged in "serial

violations" of "sufficiently related" discriminatory acts, of which at least one falls within the relevant period of limitations or (2) carried out a "systematic policy or practice" of discrimination that operated in part within the limitations period. *Cherosky*, 330 F.3d at 1246. In *Morgan*, however, the Supreme Court substantially limited the continuing violations doctrine, rejecting its application to so-called "serial violations" that constituted discrete acts.[2] Specifically, the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.

A discrete discriminatory act is conduct that "'occurred' on the day it 'happened,'" such as "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 110, 114. For discrete discriminatory acts, "[e]ach incident of discrimination . . constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114. If a discrete act falls outside the statute of limitations period, then any claim based on that act is time-barred. *Id.* at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). A plaintiff, however, may still use evidence of time-barred acts as relevant background to support a related claim that is timely. *Id.*

The Supreme Court in *Morgan* also clarified that an "entire hostile work environment encompasses a single unlawful employment practice," and the underlying acts are therefore not discrete acts that preclude application of the continuing violations doctrine. *Id.* at 117-18.

---

[2] Although the Court in *Morgan* addressed the continuing violations doctrine in the context of a Title VII claim, the Ninth Circuit applies *Morgan*'s analysis to other federal civil rights laws. *See Cherosky*, 330 F.3d at 1246 n.3 (applying *Morgan*'s analysis of the continuing violations doctrine to the Rehabilitation Act and noting that "the Supreme Court's analysis of the continuing violations doctrine is not limited to Title VII actions" and "applies with equal force . . . to actions arising under other civil rights laws").

Because "the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim" so long as "any act that is part of the hostile work environment" occurred within the limitations period. *Id.*

The Supreme Court in *Morgan* did not address the validity of the second approach, the "systematic policy or practice" continuing violation. *Id.* at 123 n.9. The Ninth Circuit, however, has since significantly limited the availability of pattern-or-practice continuing violations. *See Bird v. Dep't of Human Servs.*, 935 F.3d 738, 747-48 (9th Cir. 2019) (describing the Ninth Circuit's treatment of pattern-or-practice continuing violations since *Morgan*); *see also Pouncil v. Tilton*, 704 F.3d 568, 579 (9th Cir. 2012) (stating that ongoing effects from an alleged discriminatory policy do not establish a continuing violation); *Cherosky*, 330 F.3d at 1247-48 (stating that a pattern-or-practice continuing violation must be "widespread throughout a company or . . . a routine and regular part of the workplace" and that individualized decisions made pursuant to a policy "are best characterized as discrete acts, rather than as a pattern or practice of discrimination"); *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002) (noting that the plaintiff must plead a "pattern or practice claim" rather than an individualized claim based on discrete acts to establish a pattern-or-practice continuing violation). *But see Flynt v. Shimazu*, 940 F.3d 457, 463-64 (9th Cir. 2019) (applying the continuing violations doctrine to the State of California's ongoing enforcement of an allegedly unconstitutional statute).

Recently, in *Bird v. Department of Human Services*, the Ninth Circuit held that because the plaintiff had only asserted an individualized claim and not a class action, the pattern-or-practice continuing violations doctrine did not apply. 935 F.3d at 749. The plaintiff in *Bird* alleged that the Department of Human Services continually violated her constitutional rights

by placing her on the Central Child Abuse Registry and subsequently refusing to hold an administrative hearing. *Id.* at 741. Because those two events occurred outside the statute of limitations period, the district court dismissed the claim as untimely. *Id.* at 743. The Ninth Circuit affirmed, rejecting the plaintiff's argument that the continuing violations doctrine saved her claim. *Id.* at 748. The court explained that to invoke what is left of the pattern-or-practice continuing violations doctrine, the plaintiff must pursue a "class-wide" claim. *Id.* at 748 ("Moreover, while we have left room for the systematic branch [of the continuing violations doctrine] to apply to class-wide pattern-or-practice claims, . . . we have consistently refused to apply the systematic branch to rescue individualized claims that are otherwise time-barred."); *id.* at 748 n.8 (noting that although the plaintiff had "styled her complaint as a class action," she had not moved for class certification or otherwise pursued the class claim).

Two months later, in *Flynt v. Shimazu*, the Ninth Circuit again addressed the continuing violations doctrine, holding that the doctrine applied to a claim arising from California statutes' ongoing restriction of the plaintiffs' actions. 940 F.3d at 462-63. In *Flynt*, gambling licensees challenged the constitutionality of California statutes that prohibited cardroom licensees from holding more than a one-percent interest in out-of-state casinos. *Id.* at 460. The licensee plaintiffs had violated those statutes and as a result, the California Gambling Commission refused to renew their licenses and imposed a fine. *Id.* at 460. The licensees did not bring their lawsuit within the two-year limitations period after the California Gambling Commission issued its decision. *Id.* at 460-61. The licensees argued that the continuing violations doctrine applied because after they suffered enforcement consequences for violating the statutes at issue, they continued to decline investment opportunities they otherwise would have pursued had those statutes not been in effect. *Id.* at 462. The Ninth Circuit agreed, explaining that due to the "the continued existence of

the statutes themselves and the realistic threat of future enforcement," the plaintiffs "suffer[ed] a new injury each time they abstain[ed] from investing." *Id.* at 463.

Drawing from the post-*Morgan* line of Ninth Circuit cases ending with *Bird* and *Flynt*, it appears that there remain two methods of establishing a continuing violation. First, if a plaintiff alleges a systematic pattern or practice of discrimination, he or she must assert a class-wide pattern-or-practice claim to invoke the continuing violations doctrine. *Bird*, 935 F.3d at 748 & n.8; *Cherosky*, 330 F.3d at 1247-48; *Lyons*, 307 F.3d at 1108. Second, if a plaintiff challenges the legality of a statute, the continuing violation doctrine applies so long as the statute continues to inflict some harm on the plaintiff and there is a realistic threat of enforcement during the limitations period. *Flynt*, 940 F.3d at 463-64. *But see Pouncil*, 704 F.3d at 579 (holding that continued effects of a decision made pursuant to a policy does not invoke the continuing violations doctrine).

Oregon courts similarly distinguish between discrete acts and continuing violations. *See, e.g.*, *Blackburn v. Or. Educ. Ass'n*, 127 Or. App. 607, 611 (1994) (holding that a series of public sector union "fair share fee" assessments for nonunion members constituted discrete events rather than a continuing violation). Oregon case law expounding on the continuing violations doctrine is sparse. Thus, just as Oregon courts applying Oregon's employment discrimination statutes look to federal case law interpreting Title VII, the Court also looks to federal law applying the continuing violations doctrine to Title VII claims in assessing whether Tsur timely brought his state law claims. *See Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 711 (2012) (examining federal case law interpreting Title VII as guidance in construing Oregon's employment discrimination statutes).

### E.  Cat's Paw Doctrine

Under a cat's paw theory of liability, the discriminatory animus of a supervisor imputes to the employer if the supervisor committed an act with discriminatory intent, intended for that act to cause an adverse employment action, and that act is a proximate cause of the ultimate adverse employment action. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) ("We therefore hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." (emphasis in original) (footnotes omitted)); *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (considering the contours of cat's paw liability and holding that "if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process"); *see also Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) ("'[C]at's paw' refers to a situation in which a biased subordinate, who lacks decision-making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006)).[3]

---

[3] Judge Richard Posner introduced the term "cat's paw" in the context of employment discrimination in *Shager v. Upjohn Co*., 913 F.2d 398, 405 (7th Cir. 1990). The Seventh Circuit later explained that "[t]he term derives from the fable 'The Monkey and the Cat' penned by Jean de La Fontaine (1621–1695). In the tale, a clever—and rather unscrupulous—monkey persuades an unsuspecting feline to snatch chestnuts from a fire. The cat burns her paw in the process while the monkey profits, gulping down the chestnuts one by one." *Staub v. Proctor Hosp*., 560 F.3d 647, 650 (7th Cir. 2009), *rev'd and remanded*, 562 U.S. 411 (2011).

# BACKGROUND[4]

Tsur immigrated to the United States from Israel in 1981. He began working at Intel in 1984 as an independent consultant and later joined as a full-time employee in May 2011 at the age of 58. Within months of beginning as a full-time employee, Tsur's supervisor, Jones, allegedly began regularly commenting on Tsur's age and Israeli national origin. For example, Jones told Tsur: "If you think age is an advantage in this job, you are mistaken" and "Coming from a small country like Israel, do not expect too much cooperation from other departments at Intel." Soon thereafter, other employees in Jones's department followed his lead, calling Tsur names such as "old man." In July 2011, Jones removed Tsur from his position as a technical lead of a new project and replaced him with a younger, less-qualified employee.

In April 2012, Tsur sent a letter to the vice president of his department about Jones's age-related comments and requested a new supervisor. Two months later, Deanna Thronson (Thronson) from Intel's human resources department called Tsur to inform him that she had investigated Jones's comments and concluded that Jones exhibited no age discrimination. Tsur alleges that during Thronson's investigation, Jones became aware of Tsur's report.

Beginning in May 2012 and continuing throughout Jones's supervision of Tsur, Jones attempted to interfere with Tsur's work performance. First, Jones attempted to prevent Tsur from participating in a work trip to Germany with another department after the manager of that department specifically recruited Tsur for the trip. Next, Jones issued to Tsur a series of declining performance reviews. Jones gave Tsur a "Satisfactory" rating in his annual review for his work in 2011. In September 2012, however, Jones issued Tsur a "Below Expectations"

---

[4] For purposes of the pending motion, the Court takes as true the well-pleaded facts alleged in the Complaint.

performance review and then in December an additional "Improvement Required" note. Following those performance reviews, on December 6, 2012, a representative from Intel's human resources department presented Tsur with a choice of "voluntary separation" from Intel or a "Corrective Action Plan." One week later, Jones issued Tsur a pre-firing notice and advised Tsur to resign. Instead, Tsur agreed to the Corrective Action Plan.

In January 2013, Tsur accepted an offer to transfer to a new department within Intel and work under a different supervisor. Jones, however, attempted to block Tsur from transferring to that new department before completing the Corrective Action Plan under Jones's supervision. Despite Jones's efforts, Tsur's transfer was approved. Tsur then wrote a letter to Thronson, requesting that she continue her investigation of Jones's conduct. Tsur alleges that Thronson did not continue the investigation.

After Tsur transferred to his new position in a different department, Jones issued Tsur an "Improvement Required" performance review for the previous year. Jones also encrypted the file containing that review, which prevented Tsur and Intel supervisors other than Jones from reading Jones's rationale for his low rating of Tsur's work. Tsur also learned that within the first few months of his transfer, Jones had attempted to reverse the transfer and bring Tsur back to his department by submitting criticism of Tsur to Intel's human resources department.

In Tsur's remaining tenure at Intel, his performance reviews included stock options awarded under Intel's "Restricted Stock Unit" (RSU) policy. Intel's RSU policy awarded eligible employees with time-vesting stock options to incentivize them to remain at Intel. Supervisors awarded these stock options on a sliding scale, with "Stock Share Level 1" being the most valuable and "Stock Share Level 5" being the least valuable. To carry out Intel's goal of employee retention, supervisors assigned Stock Share Levels based on the employee's potential

future performance, rather than the employee's past performance. The stock options vested five years after issuance, and upon retirement, the employee earned a one-year accelerated vesting for every five years he or she worked at Intel. Intel encouraged supervisors to assign Stock Share Levels 4 and 5 to at least 20 percent of their employees. One of Tsur's supervisors told him that Intel supervisors awarded the high-valued stock options to younger employees because the supervisors knew that younger employees were more likely to leave for a competitor.

One year after transferring from Jones's department, Tsur earned a "Successful" performance review from his new supervisor, Steven Nahas (Nahas). Nahas also issued Tsur a Restricted Stock Unit award of Stock Share Level 4, one of the less valuable stock options. That same month, in April 2014, Tsur transferred to a new department following a reduction in force directive from Intel's upper management.

About one year after transferring to his third department, in March 2015, Tsur earned a "Successful" performance review. Roger Rees (Rees), Tsur's new supervisor, awarded him a Stock Share Level 5 but noted that Tsur's salary already exceeded Intel's mandated pay scale and awarded Tsur an unusually high performance bonus of 11.4 percent.

In June 2015, Avi Avraham (Avraham), from Intel's upper management, informed Tsur that Intel had designated him to be part of a 1,155-employee layoff. Avraham told Tsur that those at the corporate level made the layoff selections and that he did not know why they selected Tsur. Tsur also received a letter from Intel that month[5] documenting his layoff and explaining that Tsur's termination would be permanent.

-----

[5] In his response to Intel's Partial Motion to Dismiss and Motion to Strike, Tsur noted that ¶ 31 of the Complaint contains a typographical error, alleging the date of the termination letter as June 15, 2018, instead of June 15, 2015. Tsur requests that the Court give him leave to amend the Complaint to reflect the correct year. The Court grants Tsur's request and considers the date alleged in ¶ 31 of the Complaint to read "June 15, 2015."

Intel's letter stated that Tsur had been selected for termination because (1) he had received a Stock Share Level 5 that year and (2) a performance review of "Improvement Required" or "Below Expectations" or a Stock Share Level 4 or 5 in the previous three years. The letter also confirmed that Tsur's termination was permanent. Tsur alleges that statistical evidence demonstrates that there is a significant age-based disparity among those selected for the June 2015 layoff. After Tsur's termination, his former supervisor, Rees, attempted to hire Tsur as an independent contractor, only to discover that Tsur had been "blacklisted." As a result, Tsur was not eligible to return to any form of employment at Intel, whether as a full-time employee or independent contractor.

After learning of his layoff, Tsur tried to invoke Intel's "open door" review process, which allowed employees to seek reconsideration of their performance reviews and stock level awards. Tsur wanted Intel's management to reconsider Tsur's performance evaluations that had formed the basis for his selection for termination, because he believed those evaluations did not accurately reflect his performance. Intel denied Tsur's requests. Younger employees of United States origin who had not reported discrimination, however, successfully used the open door process to change an "Improvement Required" review to "Successful" and a Stock Share Level 4 to a Level 3. One year later, Intel laid off another 12,000 employees, which included a significantly disproportionate share of older employees.

Tsur also alleges that Intel harbored a "longstanding culture of ageism." Those in management positions made clear that Intel employees should retire at age 65 and offered inducements to retire earlier. Intel management also actively discouraged older employees from remaining at Intel by targeting with hostility the employees that had not retired by the age of 65. On January 12, 2016, Tsur dual-filed a complaint with BOLI and the EEOC. Tsur commenced

this lawsuit on April 29, 2021, asserting seven claims of age and national origin discrimination under the ADEA, Title VII, and Oregon's anti-discrimination statutes.

## DISCUSSION

Intel moves to dismiss: (1) Tsur's age-based hostile work environment harassment claim and retaliation claim in their entirety as time-barred; (2) Tsur's age discrimination disparate treatment and disparate impact claims to the extent that they are based on events that occurred before the applicable limitation periods; and (3) Tsur's national origin claims in their entirety as time-barred. Tsur has agreed to withdraw his national origin hostile work environment claim. Intel also moves to strike the allegations in the Complaint that relate to time-barred events.

### A.  Motion to Dismiss

#### 1.  Age Discrimination

##### a.  Disparate Treatment

Tsur bases his age discrimination disparate treatment claim on Jones's conduct in 2011 and 2012, Tsur's receipt of low-value stock grant awards in 2014 and 2015, Tsur's selection for the 2015 layoff, Intel's designation of his layoff as a permanent termination, and Intel's refusal to reconsider Tsur's performance reviews and stock awards after his selection for the layoff. Intel moves to dismiss Tsur's disparate treatment claim in part. Intel only moves to dismiss Tsur's disparate treatment claim to the extent that it is based on the following events, which Intel asserts are time-barred: Jones's conduct in 2011 and 2012 and the performances reviews and stock awards Tsur received before 2015. Intel does not move to dismiss Tsur's disparate treatment claim to the extent that it is based on Tsur's receipt of a low-value stock award in 2015, Tsur's layoff and permanent termination, and Intel's refusal to reconsider Tsur's performance reviews and stock awards. *See* ECF 13, at 15 ("Paragraphs 11, 15, 20, 21, 24 and 25 [of the Complaint] are all time barred under the ADEA and state statute. . . . Likewise Plaintiff's allegations that

his 2012-2014 performance ratings Discussed in Paragraphs 17, 25 and 27 are both time barred and cannot serve as a stand-alone basis for a disparate treatment claim . . . . Plaintiff's age discrimination claims in Count One based upon these discrete employment actions fail to state a claim upon which relief can be granted and should be dismissed."). At oral argument, Intel clarified that it does not dispute at this stage of the litigation any application of the cat's paw doctrine to Plaintiff's claim that on or after March 18, 2015 Intel subjected Tsur to disparate treatment based on age.

Tsur responds that the entirety of his disparate treatment claim is timely because the events that occurred outside any applicable statute of limitations are sufficiently related to those that occurred within the limitations period and thus constitute a continuing violation. The Supreme Court, however, rejected this theory. *See Morgan*, 536 U.S. at 105 (rejecting the Ninth Circuit's "sufficiently related" continuing violations test). Because Tsur is not challenging the enforcement of a statute like the Ninth Circuit considered in *Flynt*, to allege a continuing violation sufficient to circumvent the statute of limitations, Tsur must assert a class-wide pattern-or-practice claim alleging that Intel engaged in a widespread pattern or practice of discrimination throughout Intel. *See Bird*, 935 F.3d at 748 & n.8.

Tsur, however, brings only an individualized disparate treatment claim based on the following events: Jones's treatment of Tsur in 2011 and 2012, Jones's low rating of Tsur's work performance, Tsur's low-value stock grant awards throughout his employment, Intel's selection of Tsur for a layoff in 2015 based in part on Jones's performance reviews of Tsur, Intel's refusal to reconsider Tsur's performance reviews and stock awards after his selection for the layoff, and Intel's decision in 2015 to terminate Tsur's employment permanently.

These events do not establish a pattern-or-practice claim. Tsur does not assert a class-wide claim alleging a pattern-or-practice continuing violation as *Bird* requires. *Bird*, 935 F.3d at 748 & n.8. Tsur does include some allegations relating to Intel's broader practices, including the following: Intel's pressure and inducement of older workers to retire at or before age 65, Intel's hostility towards workers who did not retire by age 65, Intel's award of lesser-valued time-vesting stock options to older employees, and Intel's selection of a disproportionate number of older employees for layoffs. Tsur, however, does not assert a class-wide pattern-or-practice claim on behalf of similarly situated older employees at Intel. Instead, the events that serve as the basis for Tsur's disparate treatment claims are discrete acts relating only to Tsur. These acts begin individual limitations periods. *See Morgan*, 536 U.S. at 105. Thus, under the guidance of *Morgan* and subsequent Ninth Circuit authority, each of those discrete events that occurred before the applicable statute of limitations is time-barred and not actionable. *See Morgan*, 536 U.S. at 113; *Bird*, 935 F.3d at 748 & n.8.

The Court grants Intel's partial motion to dismiss Tsur's age discrimination disparate treatment claim. Because Intel only moves to dismiss Tsur's claims based on events that occurred before January 12, 2015, however, the Court does not dismiss Tsur's disparate treatment claim based on his 2015 stock award, selection for layoff, permanent termination, and Intel's refusal to reconsider Tsur's performance reviews and stock awards, including Tsur's reliance on a "cat's paw" theory of liability.

### b.  Disparate Impact

Intel moves to dismiss Tsur's age discrimination disparate impact claim in part. Intel only moves to dismiss Tsur's disparate impact claim to the extent that it is based on time-barred events. Intel does not move to dismiss Tsur's disparate impact claim to the extent it is based on the 2015 layoff. *See* ECF 13, at 16 ("Count Two should be dismissed to the extent it alleges

disparate impact based upon any employment action other than the 2015 reduction in force."). At oral argument, Intel clarified that it also does not dispute at this stage of the litigation any application of the cat's paw doctrine to events that occurred on or after March 18, 2015. In response, Tsur states that his disparate impact claim is "timely" but offers no supporting explanation or argument. Nor does he make clear which of Intel's policies form the basis of Tsur's disparate impact claim.

At oral argument, Tsur's counsel also clarified that his disparate impact claim is based on Intel's methods for selecting employees for the 2015 layoff, which includes its reliance on the RSU policy. Intel does not move to dismiss Tsur's disparate impact claim to the extent that it is based on the 2015 layoff. To the extent that Tsur brings a separate disparate impact claim based solely on Intel's RSU policy, the Court addresses the timeliness of that claim here.[6]

Tsur alleges that he received stock awards under Intel's RSU policy in April 2014 and "in or around March 2015." ECF 1 ¶¶ 27, 29. Because any date within March of 2015 falls within the limitations period for Tsur's state law claims, he has timely brought his disparate impact claim under Oregon law. The Court denies Intel's motion as to Tsur's claim for disparate impact arising from Intel's RSU policy under Oregon law.

Tsur's allegation that he was assigned a stock award "in or about March 2015," however, does not show that he has brought a disparate impact claim based on the RSU policy within the applicable limitations period under the ADEA, which began on March 18, 2015. The Court therefore grants in part Intel's motion to dismiss Tsur's federal disparate impact claim. The following remains of Tsur's disparate impact claim: disparate impact under federal law based on

---

[6] If the Court has misinterpreted Plaintiff's disparate impact claim (or claims), the Court gives Plaintiff leave to file an Amended Complaint clarifying which policies or practices form the basis of his disparate impact claim or claims.

the June 2015 layoff and disparate impact under state law based on the June 2015 layoff and

RSU stock policy, to the extent that Tsur brings a separate disparate impact claim based on the

RSU policy.

### c. Hostile Work Environment

To state a claim for hostile work environment under the ADEA, a plaintiff must show

"severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's" age.

*Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991), *superseded*

*by statute on other grounds*, *as recognized in Dominguez-Curry v. Nev. Transp. Dep't*, 424

F.3d 1027, 1041 (9th Cir. 2005). "The working environment must both subjectively and

objectively be perceived as abusive." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th

Cir.  2000) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)). In other

words, a plaintiff must show that a reasonable person would find the work environment to be

"hostile or abusive" and that the plaintiff in fact did perceive it to be so. *Dawson v. Entek*

*Int'l*, 630 F.3d 928, 938 (9th Cir. 2011) (citing *Faragher v. City of Boca Raton*, 524

U.S. 775, 787 (1998)); *Brooks*, 229 F.3d at 924 ("When assessing the objective portion of a

plaintiff's claim, we assume the perspective of the reasonable victim."). Oregon courts require

the same showing for hostile work environment claims brought under Oregon Revised Statutes

§ 659A.030. *See H. K. v. Spine Surgery Ctr. of Eugene, LLC*, 305 Or. App. 606, 611 (Or.

App. 2020) ("Oregon courts look to federal cases construing Title VII for guidance in

construing ORS 659A.030."); *Mains v. II Morrow, Inc.*, 128 Or. App. 625, 635 (Or. App. 1994)

(stating that a hostile work environment claim under Oregon law requires harassment that is

"sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create

an abusive working environment" (simplified) (citing *Meritor Savings Bank v. Vinson*, 477

U.S. 57, 67 (1986)).

Intel moves to dismiss Tsur's age-based hostile work environment claim as time-barred. To timely bring a hostile work environment claim, a plaintiff must allege that at least one act contributing to the hostile work environment occurred within the limitations period. *Morgan*, 536 U.S. at 117. Tsur contends that the same allegations that form his disparate treatment and disparate impact claims also created a hostile work environment based on age. Specifically, Tsur points to Jones's comments about Tsur's age, Jones's decision to encrypt his performance review of Tsur, Nahas and Rees's award of low-value stock options in 2014 and 2015, Intel's refusal to follow its open door policy and reconsider Tsur's performance reviews after his selection for a layoff, Intel's pressure on older workers to retire, and Intel's "longstanding culture of ageism."

The Court assumes for purposes of this motion that Tsur was subject to a hostile work environment during the time he worked under the supervision of Jones. Tsur does not, however, allege facts showing that any hostile work environment continued after he transferred from Jones's department. An award of a low-value stock option, considered in light of Jones's comments about Tsur's age from years before, does not rise to the level of severe or pervasive abuse. Even if the awards of a low-value stock options may amount to incidents of age discrimination, the award itself, given as part of routine performance reviews, does not contribute to severe or pervasive abuse. Although Nahas and Rees commented to Tsur that they generally assigned high-value stock options to younger employees, they explained that they did so to incentivize the younger employees to stay with Intel throughout their careers. That explanation may support a claim for discriminatory treatment, but, objectively, it does not contribute to severe or pervasive abuse. Nahas and Rees did not, for example, use derogatory language about Tsur's age. To the contrary, when discussing his stock award with Tsur, Rees assured Tsur that his salary exceeded Intel's mandated pay scale and awarded Tsur a sizeable

performance bonus, indicating that he in fact valued Tsur's work and performance. *See Rotter v. ConAm Mgmt. Corp.*, 393 F. Supp. 2d 1077, 1086 (W.D. Wash. 2005) (dismissing the plaintiff's age-based hostile work environment claim to the extent it was based on events that occurred after his transfer from an alleged discriminatory supervisor and noting that subsequent alleged offensive comments "occurred during casual conversation and were arguably aimed at advising rather than degrading [Plaintiff]").

Intel's refusal to follow its open door policy after Tsur had been selected for a layoff similarly does not contribute to an environment of severe or pervasive abuse, even considering Jones's comments from years before as relevant background information. Tsur alleges that Intel followed its open door policy with younger employees, some of whom successfully changed their evaluations from "Improvement Required" to "Successful" and Stock Share Level 4 to a Level 3. That differential treatment without more, however, does not contribute to severe or pervasive abuse, although, again, it may support a disparate treatment discrimination claim.

Tsur also alleges that Intel's "longstanding culture of ageism" and Intel's practice of pressuring older workers to retire contributed to a hostile work environment. Tsur, however, only alleges that he was "immersed" in a culture of ageism and does not explain how that culture created a hostile work environment. Further, Tsur has not alleged that Intel directly pressured Tsur to retire after he transferred from Jones's department. In other words, Tsur's general allegations that Intel harbored a culture of ageism and pressured older workers to retire, without more specificity, cannot indefinitely extend any hostile work environment that may have arisen under Jones's supervision.

In sum, even if Tsur experienced a hostile work environment during the time he worked for Jones, that hostile environment ceased when Tsur transferred away from Jones's department

and supervision. Tsur transferred departments twice after working for Jones, and after his first transfer, Tsur did not otherwise continue to work with or interact with Jones. Tsur also has not sufficiently alleged that he heard any derogatory comments about his age or experienced any other act that would contribute to an environment of severe or pervasive abuse after leaving Jones's supervision. Considering the totality of the circumstances, any hostile work environment that may have existed under Jones's supervision ended in January 2013 when Tsur transferred departments, three years before the statute of limitations period. Thus, Tsur's age-based hostile work environment claim is time-barred, and the Court grants Intel's motion to dismiss that claim.

### d. Retaliation

To state a claim for retaliation under the ADEA, a plaintiff must show: "(1) the plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment action, and (3) there was a causal link between the plaintiff's protected activity and the adverse employment action." *Poland*, 494 F.3d at 1179-80. A "causal link" is equivalent to but-for causation under the ADEA. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). The plaintiff must also show the defendant "was aware that the plaintiff had engaged in protected activity." *Maner v. Dignity Health*, --- F.4th ---, 2021 WL 3699780, at *11 (9th Cir. 2021) (quoting *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003)). If a plaintiff brings a retaliation claim against his or her employer as an entity, the plaintiff must show that the individual decisionmakers responsible for the adverse employment action knew of the plaintiff's protected activity. *See Raad*, 323 F.3d at 1197 (stating that the plaintiff, suing a school district, must show that the "principals who refused to hire her were aware that she had engaged in protected activity").

Intel raises two arguments in support of its motion to dismiss Tsur's age discrimination retaliation claim: (1) the alleged retaliatory acts that occurred before January 12, 2015 are

time-barred and (2) the remaining acts fail to establish the prima facie elements of a retaliation claim. Tsur responds that the entirety of his retaliation claim is timely because he alleges a series of "recurring and related" retaliatory actions that constitute a continuing violation. Tsur's argument is misplaced, because the Supreme Court in *Morgan* and subsequent Ninth Circuit authority requires more. *See Morgan*, 536 U.S. at 105; *Bird*, 935 F.3d at 748 & n.8. To establish a continuing violation, Tsur must bring a class-wide pattern-or-practice retaliation claim alleging that Intel engages in a widespread systematic pattern of retaliation. *See Bird*, 935 F.3d at 748 & n.8. Tsur has not done so. Tsur asserts only an individualized claim for age discrimination retaliation based on alleged incidents of retaliation that affected only himself. Tsur has alleged no facts that show Intel engaged in a widespread pattern or practice of age discrimination retaliation. Thus, the continuing violations doctrine does not apply to Tsur's age discrimination retaliation claim and the alleged incidents of retaliation that occurred before January 12, 2015 are time-barred, although they remain relevant to show retaliatory motive. *See Moore v. King Cty. Fire Prot. Dist. No. 26*, 2005 WL 2898065, at *7 (W.D. Wash. Oct. 31, 2005) ("In addition, while Mr. Lawrence's conduct toward Mr. Moore from 1996 through 1999 is not actionable, it is admissible as evidence of retaliatory motive." (citing *Morgan*, 536 U.S. at 113)).

What remains of Tsur's retaliation claim is Intel's selection of Tsur for the June 2015 layoff, Intel's refusal to reconsider Tsur's prior performance reviews, and Intel's decision to terminate Tsur's employment permanently. Tsur raises the cat's paw theory of liability to establish a causal connection between Jones's alleged retaliatory animus and Tsur's layoff and termination. Tsur alleges that Intel terminated Tsur "in reliance" on Jones's performance reviews finding that Tsur required improvement, and that in doing so Intel "knowingly reaffirmed and continued Mr. Jones' unlawful discrimination and retaliation against Mr. Tsur." ECF 1 ¶ 38.

Thus, alleges Tsur, Intel's termination of Tsur "was motivated in substantial part by Mr. Jones' unlawful discriminatory and retaliatory animus." *Id.*

In support of this allegation, Tsur points to the following excerpt from a letter he received from Intel informing him of his permanent termination:

> Because you received: (1) a current 2015 focal or out-of-cycle rating of Improvement Required (IR); or (2) a stock share level (SSL) 4 or 5 in the 2015 focal and, in the past three years, another low rating (IR or Below Expectations (BE)) at focal or out-of-cycle or a stock grant of SSL 4 or 5, you were selected for this involuntary separation.

ECF 1 ¶ 31. Jones gave Tsur two "Improvement Required" performance reviews, one in 2012 and one 2013 (one while he supervised Tsur and one shortly after Tsur transferred to a new department), and one "Below Expectations" performance review in 2012. Tsur alleges that Jones issued those reviews in retaliation for Tsur's report of Jones's conduct. Tsur argues that because of those performance reviews, Jones's retaliatory motive is a proximate cause of Tsur's layoff and firing.

Intel's letter is not clear as to whether it selected Tsur for involuntary separation because Nahas awarded Tsur a Stock Share Level 4 in 2014 thereby meeting the requirements of the letter (in conjunction with Rees's stock share award of Level 5 in 2015) regardless of performance reviews or because Jones gave Tsur "Improvement Required" and "Below Expectations" performance reviews in 2012 and 2013. At this stage in the litigation, however, the Court accepts as true Tsur's allegation that he was selected for involuntary separation and termination in reliance on Jones's performance reviews. *See* ECF 1 ¶ 38. This includes Tsur's allegation that after he received notice of his involuntary separation and before his termination, he requested that Intel reconsider those performance reviews because they did not accurately reflect Tsur's performance. ECF 1 ¶ 33.

PAGE 24 – OPINION AND ORDER

Intel argues that even if discriminatory animus motivated Jones's performance reviews, Tsur fails to allege facts showing that Jones prepared those performance reviews with the intent to lead to an adverse employment action. This argument is not persuasive. Tsur alleges that Jones issued Tsur a series negative performance reviews until Tsur was faced with the choice of leaving Intel or undergoing a Corrective Action Plan. Tsur also alleges that after he secured an offer to work in a different department and away from Jones's supervision, Jones attempted to block that transfer and then, when unsuccessful, attempted to reverse the transfer and require that Jones complete the Corrective Action Plan under his supervision. Further, after Tsur's transfer, Jones issued Tsur an additional "Improvement Required" review for his work from the previous year and encrypted the review so that neither Tsur nor other supervisors could read Jones's explanation for the rating. These allegations, coupled with Jones's demeaning comments about Tsur's age and national origin, support the inference that Jones issued his 2012 and 2013 performance reviews of Tsur with the intent that they would lead to an adverse employment action. Tsur alleges that they did—his involuntary separation and termination.[7]

Intel further argues that cat's paw does not apply because Plaintiff fails to allege facts showing that Jones's retaliatory animus caused Intel's 2015 reduction in force directive. The question is not, however, whether retaliatory animus caused the decision to implement a reduction in force, but whether retaliatory animus caused the decision to select Tsur for the layoff. As the Supreme Court has explained, the cat's paw theory imputes animus even if the

---

[7] Intel asserts that Tsur must allege that Jones's conduct influenced each of Tsur's subsequent supervisors in a "chain reaction" that led to his separation and termination. That is not what the cat's paw theory requires. The cat's paw theory requires that the allegedly discriminatory supervisor influence the ultimate decisionmaker. *Poland*, 494 F.3d at 1182. Tsur alleges that Jones's discriminatory performance reviews influenced the ultimate decisionmaker because that decisionmaker relied on Jones's performance reviews to select Tsur for involuntary separation and termination.

animis is only one among several proximate causes for the adverse employment action: "The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *Staub*, 562 U.S. at 1192 (emphasis in original). The key is whether "the ultimate decision-maker, lacking individual discriminatory intent, takes an adverse employment action in reliance on factors affected by another decision-maker's discriminatory animis." *Galdamez v. Potter*, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005). "Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect." *Staub*, 562 U.S. at 1192 (simplified). An employer may take the adverse action for reasons other than the supervisor's biased report, but that is the employer's burden to show. *Id.* at 1193. Further, a "supervisor's biased report may remain a causal factor if the independent [action] takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.*

Here, Tsur adequately alleges that Jones's alleged retaliatory animis was a proximate cause of Intel's decision to select Tsur for the layoff because Tsur alleges that Intel chose Tsur for the layoff in part because Tsur had received low performance reviews from Jones. Tsur also alleges that age discrimination, national origin discrimination, and retaliatory animis motivated those low performance reviews. Even if other factors may also have caused Tsur's eligibility for the layoff, Tsur has sufficiently alleged that Jones's retaliatory animis was at least one proximate cause. Accordingly, the Court grants in part (alleged conduct before the statute of limitations period) and denies in part (the layoff and termination) Intel's motion to dismiss Tsur's age-based retaliation claim.

2. **Title VII National Origin Discrimination**

a. **Disparate Treatment**

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. The plaintiff must show that the improper discrimination was a "motivating factor" of an adverse employment action. 42 U.S.C. § 2000e–2(m); *Gross*, 557 U.S. at 174. "Disparate treatment occurs 'where an employer has treated a particular person less favorably than others because of a protected trait.'" *Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). The "central element" of a disparate treatment claim is "discriminatory intent." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 624 (2007). Thus, a plaintiff alleging disparate treatment "must establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Wood*, 678 F.3d at 1081 (quoting *Ricci*, 557 U.S. at 577). This requires more than showing an employer knew that its actions might have adverse consequences on the protected person. *Id.* Oregon's anti-discrimination statutes mirror Title VII and require the same prima facie elements for disparate treatment. *Ossanna v. Nike, Inc.*, 365 Or. 196, 204-05 (2019) (stating that Oregon courts "look[] to Title VII precedent for guidance in analyzing claims brought under analogous provisions of ORS chapter 659A"); *Portland State Univ.*, 352 Or. at 711 (stating that ORS Chapter 659A parallels Title VII); *Henderson v. Jantzen, Inc.*, 79 Or. App. 654, 657 (Or. App. 1986) (adopting the prima facie elements of disparate treatment under Title VII for Oregon Revised Statutes Chapter 659 actions (now renumbered as Chapter 659A)).

Intel moves to dismiss Tsur's national origin disparate treatment claim on the basis that all events that occurred before 2015 are time-barred and that Tsur has not stated a prima facie claim with respect to those events that occurred after 2015. Tsur bases his national origin disparate treatment claim on the same events that form the basis for his age discrimination

disparate treatment claim. Thus, for the same reasons described above with respect to his age discrimination disparate treatment claim, the continuing violations doctrine does not apply to Tsur's national origin disparate treatment claim. The events that occurred before March 18, 2015 are time-barred and not actionable under Title VII or Oregon Revised Statutes § 659A.030.

The timely events that form the basis for Tsur's national origin disparate treatment claim are his layoff and permanent termination. Tsur has alleged no facts showing that those who either did select or may have selected him for the layoff knew of his national origin. Neither has Tsur alleged any circumstantial evidence, such as statistical evidence, suggesting that Tsur's national origin was a motivating factor for his selection. Like with his age discrimination retaliation claim, however, the cat's paw theory applies here.

Tsur alleges that discriminatory animus based on his national origin, age, and retaliation motivated Jones's decision to give Tsur low ratings on his performance reviews. For the reasons described above, Jones's animus imputes to those who selected Tsur for the layoff and permanent termination because Intel allegedly relied on those reviews in selecting Tsur. Tsur has therefore sufficiently alleged that, due to Jones's imputed discriminatory animus, national origin was a motivating factor of Tsur's layoff and permanent termination. Accordingly, the Court grants in part (alleged conduct that occurred before the statute of limitations) and denies in part (the layoff and termination) Intel's motion to dismiss Tsur's national origin disparate treatment claim.

### b. Hostile Work Environment

Tsur stipulates to Intel's motion to dismiss his national origin hostile work environment claim. Accordingly, the Court grants Intel's motion to dismiss Tsur's national origin hostile work environment claim.

### c. Retaliation

Like with a retaliation claim under the ADEA, to state a claim for retaliation under

Title VII, the plaintiff must show "1) he engaged in a protected activity; 2) he suffered an

adverse employment decision; and 3) there was a causal link between the protected activity and

the adverse employment decision." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th

Cir. 2002). The protected activity must be the but-for cause of the adverse employment action.

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("The text, structure, and history

of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must

establish that his or her protected activity was a but-for cause of the alleged adverse action by the

employer."). Oregon law requires a similar showing. *Summerfield v. Or. Liquor Control

Comm'n*, 366 Or. 763, 780 (2020) (rejecting the defendant's argument that Oregon law imposes

a higher burden for retaliation claims that does Title VII); *Meyer v. State ex rel. Or. Lottery*, 292

Or. App. 647, 678 (Or. App. 2018) (stating that the prima facie elements of retaliation under

Oregon's anti-discrimination statute are "substantially similar" to the parallel provision of

Title VII).

Tsur has not alleged that he engaged in any protected activity with respect to his national

origin. Tsur alleges that in his letter to Thronson requesting that she continue her investigation of

Jones, he stated that he believed Jones had acted in retaliation to Tsur's earlier report of his

"ageist and xenophobic hostility." ECF 1 ¶ 22. But Tsur does not allege that he ever made any

report regarding Jones's "xenophobic hostility." When Tsur contacted the vice president of his

department to report Jones's conduct, he only alleges that he reported Jones's "ageist hostility"

and does not allege that he made any mention of discriminatory animus arising from Tsur's

national origin. Additionally, when Thronson completed her investigation of Jones's treatment of

Tsur, she concluded that she "had not found age discrimination" and did not refer to any

complaint about national origin discrimination. Because Tsur has not alleged that he engaged in any protected activity with respect to his national origin, his national origin retaliation claim fails. Accordingly, the Court grants Intel's motion to dismiss Tsur's national origin retaliation claim.

## B.  Motion to Strike

Intel moves to strike all allegations that occurred outside the limitations periods as immaterial to Tsur's remaining claims. Tsur, however, may use such evidence to support his remaining claims. Although the time-barred events are not actionable, they may nevertheless inform discriminatory animus relevant to Tsur's age-based disparate treatment and impact claims or provide other relevant information. *Morgan*, 536 U.S. at 113; *see also Lucke v. Multnomah Cty.*, 2008 WL 4372882, at *23 (D. Or. Sept. 22, 2008) *aff'd in part*, 365 F. App'x 793 (9th Cir. 2010) ("[W]hile time-barred acts may not be considered for purposes of liability, evidence of time-barred acts may be considered to prove timely claims."). The Court denies Intel's motion to strike.

## C.  Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that the "court should freely give leave [to amend a pleading] when justice so requires." A district court should apply Rule 15's "policy of favoring amendments with extreme liberality." *Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000) (simplified). The purpose of the rule is "to facilitate decision on the merits, rather than on the pleadings or technicalities." *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (quoting *Chudacoff v. Univ. Med. Ctr.*, 649 F.3d 1143, 1152 (9th Cir. 2011)). Here, some of Tsur's claims suffer from a lack of factual development. Under Rule 15(a), the Court grants leave to amend with liberality and thus provides Tsur with

the opportunity to allege additional facts if he is able to cure the defects identified in this Opinion and Order.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Intel's Partial Motion to Dismiss as described herein and DENIES Intel's Motion to Strike. ECF 13. Tsur has leave to file an amended complaint within two weeks from the date of this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 8th day of October 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge