# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RON TSUR**, | Case No. 3:21-cv-655-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **INTEL CORPORATION**, | |
| Defendant. | |

Shanti S. Lewallen and Lee C. Dudley, LEWALLEN LAW LLC, 65 SW Yamhill Street, Suite 300, Portland, OR 97204; and Andrew J. Horowitz and Bruce C. Fox, OBERMAYER REBMANN MAXWELL & HIPPEL LLP, 525 William Penn Place, Suite 1710, Pittsburgh, PA 15219. Of Attorneys for Plaintiff Ron Tsur.

Helen M. McFarland, SEYFARTH SHAW LLP, 999 Third Avenue, Suite 4700, Seattle, WA 98104; Christopher J. DeGroff and Andrew Scroggins, SEYFARTH SHAW LLP, 233 S. Wacker Drive, Suite 8000, Chicago, IL 60606; and Raymond C. Baldwin, SEYFARTH SHAW LLP, 975 F Street, N.W., Washington, DC 20004. Of Attorneys for Defendant Intel Corporation.

**Michael H. Simon, District Judge.**

Plaintiff Ron Tsur (Tsur) brings this lawsuit against his former employer Defendant Intel Corporation (Intel). In his Amended Complaint, Tsur alleges that Intel violated federal and state laws by: (1) discriminating against Tsur because of his age (Claim One); (2) adopting a facially neutral policy that had a disparate impact on older employees (Claim Two); (3) retaliating against Tsur for reporting and/or opposing age discrimination (Claim Three); and

(4) discriminating against Tsur because of his Israeli national origin (Claim Four). Intel moves for summary judgment on all claims. ECF 61. The Court grants in part and denies in part Intel's motion for summary judgment. For the reasons given below, Tsur may proceed to trial on his first, third, and fourth claims. The Court grants summary judgment in favor of Intel against Tsur's second claim.

## STANDARDS

### A.  Motion for Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

### B.  Cat's Paw Doctrine

Under the "cat's paw" theory of liability, the discriminatory animus of a supervisor is imputed to the employer if the supervisor committed an act with discriminatory intent, intended for that act to cause an adverse employment action, and that act is a proximate cause of the

ultimate adverse employment action. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) ("We therefore hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [the Uniformed Services Employment and Reemployment Rights Act]." (emphasis in original) (footnotes omitted)); *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (considering the contours of cat's paw liability and holding that "if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process"); *see also Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) ("'[C]at's paw' refers to a situation in which a biased subordinate, who lacks decision-making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006)). In addition, Oregon has applied federal precedent on the cat's paw doctrine to its state antidiscrimination and antiretaliation provisions. *Ossanna v. Nike, Inc.*, 365 Or. 196, 209-10 (2019) (holding that "in Oregon statutory employment discrimination and retaliation cases, a plaintiff may assert the 'cat's paw' theory" to impute bias from a supervisor without decisionmaking authority to the ultimate decisionmaker) (citing *Poland*, 494 F.3d at 1182-83).

## BACKGROUND

Tsur began working with Intel as a consultant starting in 1984. ECF 69 at 123. In 2011, after about 27 years of contract work with Intel, Tsur joined Intel as a full-time employee. *Id.* As

a full-time employee, Tsur's first supervisor at Intel was Bruce Jones (Jones). Tsur states that during his first one-on-one meeting with Jones, as well as during other meetings later, Jones made derogatory comments about Tsur's age and national origin. For example, Tsur contends that Jones told Tsur: "If you think age is an advantage in this job you are mistaken," *id.* at 105 (Tsur Dep. 225:1-6), "You Israelis have too narrow a view of the world," ECF 81-1 at 14 (Tsur Dep. 232:6-22), and "[Y]ou Israelis speak too directly with coworkers, that is not a good way to conduct business at Intel." *Id.* at 17 (Tsur Dep. 235:2-16).

Tsur requested several times to be transferred away from Jones, all without success. ECF 69 at 107 (Tsur Dep. 254:14-21). Tsur then sent a letter on April 11, 2012, to Aicha Evans (Evans), who was the vice president of the department. ECF 69 at 123-25. Tsur described his background and experience and noted in his letter that he was 59 years old at the time of Jones's comments. *Id.* Tsur highlighted that Jones had stated that he had "never managed anyone who is 10 years older than me" and told Tsur that he "didn't match the profile of [Jones's] team." *Id.* at 124. Tsur noted that Jones had given Tsur a "Satisfactory" performance review (also called a "Focal") for his work throughout 2011, but in Tsur's letter to Evans, Tsur took issue with several of Jones's qualitative comments about Tsur's behavior. *Id.* For example, Jones wrote in the evaluation that Tsur engaged in "building Silos" and "Tom Sawyerism." *Id.* at 125. Tsur explained to Evans that these comments were "ludicrous" and "bad spirited." *Id.*

Jones had also given Tsur a "Stock Share Level" award of 3 (SSL3). ECF 69 at 110-12 (performance review), 116-17 (stock letter and pay letter).[1] Intel has a "Restricted Stock Unit"

---

[1] Contemporaneous documents indicate that Tsur received his performance evaluation on April 9, 2012. *See* ECF 69 at 124 (letter from Tsur dated April 11, 2012, referring to the evaluation as having been received "This Monday," two days earlier). The parties both use the date of April 9, 2012 when referring to Jones's evaluation of Tsur's performance in 2011. Jones delivered this evaluation to Tsur in April 2012. ECF 64 at 3 (Jones Decl. ¶ 10). Tsur's stock and

(RSU) policy that awards eligible employees with time-vesting stock options as a form of bonus compensation. ECF 65 at 4 (Sanchez Decl. ¶ 9). [2] Supervisors can award employees with stock options on a sliding scale, from "Stock Share Level 1" (SSL1), which offers the most stock options, to "Stock Share Level 5" (SSL5), which provides no stock options. *Id.* (Sanchez Decl. ¶ 11). These stock options vest five years after issuance. ECF 69 at 160 (Begis Aff. 1).[3] Supervisors were encouraged to assign SSL5 awards to five percent of the employees they supervised. *Id.* at 156 (Rees Aff. 4).

In a 2012 email, Tsur stated that he expected his letter to Evans would be kept confidential and hoped that Tsur could resolve his situation with Jones through mediation. *Id.* at 127. Tsur's letter, however, was forwarded to Intel's Human Resources department and given to Deanna Thronson (Thronson), who began an investigation into Tsur's concerns. *Id.* at 99-100 (Thronson 30(b)(6) Dep. 49:12-50:11); *see also* ECF 63 at 2 (Thronson Decl. ¶ 3). Thronson first spoke with Tsur in spring 2012. ECF 63 at 3 (Thronson Decl. ¶ 4).

The parties present differing versions of what was said during Thronson and Tsur's first conversation. Thronson states in her declaration that she asked Tsur about his recitation of Jones's age-related comments about not managing anyone ten years older than himself and Tsur

---

pay letters for his 2011 performance, however, are dated March 18, 2012, and indicate that Tsur's pay change became effective on April 1, 2012. ECF 69 at 116-17.

[2] David Sanchez (Sanchez) is an Intel employee who held various Human Resources-related positions and based on this work experience, submitted an affidavit describing Intel's Code of Conduct, Employment Guidelines, compensation, and other internal policies in support of Intel's motion for summary judgment. ECF 65 at 2 (Sanchez Decl. ¶¶ 2-3, 9-11).

[3] Glenn Begis (Begis) was a manager at Intel who submitted an affidavit in support of Tsur's claims against Intel. Begis was also deposed in this action. According to Begis's testimony in deposition, Begis did not work directly with Tsur at Intel. ECF 71-1 at 9-10 (Begis Dep. 109:4-110:3).

not matching the "profile" of Jones's "team." *Id.* (Thronson Decl. ¶ 5). Thronson contends that

Tsur "did not want to complain about any unfair treatment regarding his age" or "tell [Thronson]

that Mr. Jones made any age-related comments." *Id.* (Thronson Decl. ¶ 6). Instead, according to

Thronson, Tsur focused on rebutting what he believed were inaccurate criticisms of about him.

*Id.* at 4. (Thronson Decl. ¶ 7).

      Tsur, however, testified during his deposition that in response to Thronson's questions,

Tsur confirmed that there was "age discrimination" and that he described Intel's "perception that

young people create all the innovation," which affects managers' evaluations of people by age.

ECF 62-1 at 54-55 (Tsur Dep. 240:21-241:5). This is not necessarily inconsistent with

Thronson's declaration, because someone can report conduct without wanting to "make a

complaint" about that conduct. According to Tsur, at that time he did not want an investigation

but simply asked to be reassigned away from Jones's supervision. At this stage of the litigation,

the Court must view all factual disputes, including what was said the first meeting between Tsur

and Thronson, in the light most favorable to Tsur.

      Tsur and Thronson spoke several additional times during the next few months. ECF 63 at

3 (Thronson Decl. ¶ 8). After speaking with Tsur, Jones, and others, in July 2012 Thronson

closed her investigation and concluded that Jones did not engage in any improper conduct. *Id.* at

3 (Thronson Decl. ¶¶ 8-9); ECF 62-3 at 16-22 (Thronson 30(b)(6) Dep. at 55-62, discussing the

closing of her investigation and her meeting on July 13, 2012 with Tsur to convey her findings).

Tsur and Thronson, however, continued to communicate in August and September 2012. ECF 63

at 4 (Thronson Decl. ¶¶ 11-12). Tsur believed he had additional information that would change

the findings of Thronson's investigation into Jones's conduct. ECF 62-3 at 21-22

(Thronson 30(b)(6) Dep. 61:25-62:2). Tsur also emailed Thronson on September 25, 2012,

stating that he "fully expect[s] a retaliatory action will be taken against me" by Jones. *Id.* at 24 (Thronson 30(b)(6) Dep. 64:5-9).

On about September 6, 2012, Jones prepared a mid-year "Below Expectations" evaluation of Tsur, with an effective date of September 26, 2012. ECF 69 at 133-34, 177. Intel's employee services system generated an automatic notice on October 1, 2012, about Tsur's change in status to a proficiency of "Below Expectations." *Id.* at 133. The record is unclear when the performance evaluation was delivered to Tsur. On December 6, 2012, Jones emailed others at Intel indicating that Jones planned to offer Tsur a deal: Tsur could either accept a "voluntary separation" resignation package from Intel or remain an employee. *Id.* at 138. To remain an employee, however, Tsur must (1) receive an "Improvement Required" performance rating and (2) successfully complete a "Corrective Action Plan" (CAP). *Id.*

Tsur emailed Thronson several times on December 25, 2012, including an email noting that Tsur had sent Thronson three other emails with "background information" to prepare for their telephone conference the next day. *Id.* at 126-28. One of these emails included a letter that Tsur says he composed in September. *Id.* at 127-28. Tsur, Thronson, and Intel Manager Begis spoke for more than an hour on December 26th. ECF 63 at 4 (Thronson Decl. ¶ 14). During this conversation, they discussed that if Tsur remained with Intel under the CAP, Tsur would receive an "Improvement Required" performance rating. *Id.* Ultimately, Tsur agreed to remain an employee at Intel and attempt to satisfy the CAP, rather than resign. ECF 63 at 5 (Thronson Decl. ¶ 16). Jones also gave Tsur an SSL5, along with Tsur's Improvement Required rating. *See* ECF 65 at 6 (Sanchez Decl. ¶ 22). Jones delivered Tsur's 2013 review and SSL5 award (for the year 2012) in spring 2013. ECF 64 at 5 (Jones Decl. ¶ 17).

In January 2013, Thronson authorized Tsur's transfer to a new position at Intel under a different supervisor. ECF 63 at 5 (Thronson Decl. ¶ 16). Tsur would still remain under the CAP directed by Jones, but his new supervisor would tailor its requirements and supervise its completion. *Id.* Thronson states in her declaration that Tsur never complained of discrimination or retaliation. *Id.* (¶¶ 12, 13). The record, however, contains both Tsur's September 2012 email to Thronson describing his expected retaliation from Jones, and a different letter from Tsur to Thronson, dated January 27, 2013, in which Tsur stated that Jones had retaliated against Tsur because of Thronson's investigation. ECF 69 at 130.

In April 2014, Tsur's new supervisor, Steven Nahas (Nahas), gave Tsur a "Successful" performance review and an SSL4 award for Tsur's work throughout 2013. *Id.* at 62 (Nahas Dep. 38:12-18) ("Successful" review); *Id.* at 145 (Nahas Aff. 2) (SSL4 award). Nahas stated that he gave a lower SSL award to higher-salaried employees, including Tsur, as an "equalization mechanism" for lower-salaried employees, who received higher SSL awards. *Id.* at 145 (Nahas Aff. 2). Nahas also explained that because of Jones, Nahas's department had to take Tsur under a CAP "that would restore [Tsur's] performance rating back to 'successful,'" that Tsur behaved with "true grace" even though Nahas found the whole process to be a "superfluous wringer," and that Nahas thought Jones "came off as an abrasive bully." *Id.* at 150 (Nahas Aff. 7). Nahas noted that after Tsur "very successfully" completed the CAP, his rating was "restored" to "successful" as "required" by Intel's human resource policies. *Id.*

Nahas recommended transferring Tsur to another position under a third supervisor, Roger Rees (Rees). ECF 69 at 148 (Nahas Aff. 5). In early to mid-2015, Rees gave Tsur a "Successful" performance review and an SSL5 award for Tsur's work throughout 2014. *Id.* at 170 ("Successful" review); *id.* at 155-56 (Rees Aff. 3-4) (SSL5 award). Rees stated that (1) Intel sets

strict budgets for stock allotments in each group, (2) the guidelines state that stock awards can be given based on money and considering whether an employee is paid higher relative to their peer group or for internal equity, (3) he made Tsur's stock allocation "[f]or purposes of trying to reach . . . better equity within [the] team," and 4) had Rees been able "to do what [was] right, rather than meet an artificial target, Mr. Tsur would have been granted SSL3." *Id.* at 156 (Rees. Aff. 4).

In the first quarter of 2015, Intel decided to lay off a certain number of employees in a Performance-based Mandatory Buyout (PMB layoff) to compensate for a decrease in Intel's revenue. ECF 65 at 5 (Sanchez Decl. ¶¶ 14-15). Tsur received a letter from Intel on June 15, 2015, documenting Tsur's layoff and explaining that his termination was permanent. ECF 69 at 158-59. This letter stated that Tsur had qualified for Intel's layoff criteria because (1) Tsur received an SSL5 that year and (2) a performance review of "Improvement Required" or "Below Expectations" or an SSL4 or SSL5 in the previous three years. *Id.* (Tsur's letter); ECF 65 at 6 (Sanchez Decl. ¶¶ 17, 22).

After the termination of Tsur's employment, Rees wanted to hire Tsur back as an contractor for Intel but learned that Tsur could not return to any form of work at Intel based on the terms of Intel's reduction in force policies. ECF 69 at 156 (Rees Aff. 4). On November 12, 2015, Tsur emailed Intel to ask whether he could work for Intel as a contractor. ECF 69 at 174. A representative from Intel responded that Tsur could not do so and that Intel was "*not* looking at these [*i.e.*, those affected by the 2015 layoff] on a case by case basis and are applying the policy uniformly across the board." *Id.* (emphasis added). Rees's affidavit mentions that Tsur filled out an "Open Door Employee Intake Form," dated June 17, 2015, to change his SSL5 award retroactively, and subsequently recorded a telephone conversation with Intel's Human Resources

department after Tsur's request was refused. *Id.* at 178 (Rees Aff. 1). Tsur then filed this lawsuit against Intel in April 2021. ECF 1.

## DISCUSSION

Intel moves for summary judgment against: (1) Tsur's age discrimination disparate *treatment* claims; (2) Tsur's age discrimination disparate *impact* claims; (3) Tsur's claims of unlawful retaliation for opposing or reporting age discrimination; and (4) Tsur's national origin discrimination disparate treatment claims. Tsur asserts each claim under both federal and state law. As noted in the Court's Opinion and Order on Intel's partial motion to dismiss (ECF 22), the applicable statute of limitations bars Tsur's discrimination and retaliation claims arising out of events that occurred before January 12, 2015 (for federal claims) and March 18, 2015 (for state claims).

Under Local Rule 56-1(b), Intel raises in its reply several objections challenging the evidence that Tsur submitted in response to Intel's motion. Tsur filed a sur-reply addressing these concerns. The Court first addresses these objections and then considers Intel's motion on the merits.

## A. Evidentiary Objections

Intel objects that much of the evidence that Tsur relies upon in his opposition to Intel's motion for summary judgment is unauthenticated, irrelevant, hearsay, not submitted under penalty of perjury, or inadmissible for other reasons. At summary judgment, however, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665-66 (9th Cir. 2021) (rejecting relevance, hearsay, and foundation evidentiary objections at summary judgment and noting that "[i]f the contents of a document can

be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment"); *cf.* Fed. R. Civ. P. 56(c)(2) (permitting a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); 56(c)(4) (establishing that a declaration in support of summary judgment must present "facts that would be admissible in evidence").

In evaluating a nonmoving party's facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("[T]he evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial[.]"); *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."). For example, in *Fraser* the Ninth Circuit considered a diary's contents as evidence to defeat a motion for summary judgment, despite a hearsay challenge, because the contents of the diary "could be admitted into evidence at trial in a variety of ways." *Fraser*, 342 F.3d at 1037. The court noted, for example, that the witness "could testify to all the relevant portions of the diary from her personal knowledge." *Id.* "Because the diary's contents could be presented in an admissible form at trial, we may consider the diary's contents in the [movant's] summary judgment motion." *Id.*

Intel's argument cites primarily out-of-circuit cases to support its contention that Tsur's evidence must be disregarded. The only Ninth Circuit cases cited are *Pfingston v. Ronan Engineering Co.*, 284 F.3d 999 (9th Cir. 2002), and *Orr v. Bank of America*, 285 F.3d 764 (9th Cir. 2002). *Pfingston*, however, applied the pre-2010 version of Rule 56 and noted that then-Rule 56(e) (now Rule 56(c)(4)) required affidavits to set forth facts that *would be* admissible in evidence and determined that the plaintiff failed to meet that burden. 284 F.3d at 1003-04.

*Orr* stated that only admissible evidence could be considered at summary judgment. 285 F.3d at 773. *Orr*, however, was an outlier and inconsistent with many Ninth Circuit cases, including later cases. As set forth above, many Ninth Circuit cases apply the text of then-Rule 56(e) and require only that the contents of evidence at summary judgment be able to be submitted in a form that is admissible at trial. They do not require parties to submit evidence in an already admissible form to be considered at summary judgment. In any event, the 2010 amendments to Rule 56 codified the Ninth Circuit's approach in *Fraser*, *Norse*, and *Block* and supersede the approach in *Orr*. Thus, Intel's evidentiary argument on this point is without merit.

Additionally, Tsur filed a sur-reply to address Intel's specific evidentiary arguments. ECF 72. Tsur attached three declarations to his sur-reply that cures any authentication deficiency that his earlier filings may have contained. ECF 73 (Lewallen Decl.); ECF 74 (Tsur Decl.); ECF 75 (Killingsworth Decl.). The challenged deficiencies also may be cured in Tsur's expert report or other evidence at trial. Intel does not argue that Tsur's evidence *cannot* be submitted in an admissible form at trial. Accordingly, Intel's evidentiary objections are overruled.

### B. Age Discrimination

#### 1. Disparate Treatment

Tsur alleges disparate treatment age discrimination under the federal Age Discrimination in Employment Act of 1967 (ADEA)[4] and Oregon's anti-discrimination law.[5] Tsur presents two theories of disparate treatment: one under the "cat's paw" doctrine based on Jones's purported discriminatory animus and another under Intel's purported neutral selection criteria for the 2015 reduction in force that Tsur alleges contain an inherent age bias.

"When a plaintiff alleges disparate treatment based on direct evidence in an ADEA claim, [the Ninth Circuit does] not apply the burden-shifting analysis set forth in *McDonnell Douglas Corporation v. Green.* 411 U.S. 792 (1973), in determining whether the evidence is sufficient to defeat a motion for summary judgment." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004). Direct evidence is evidence that, "if believed, proves the fact of discriminatory animus without inference or presumption." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (cleaned up). "Racist or sexist [or ageist] statements constitute such 'direct evidence' of discrimination." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 662 (9th Cir. 2002) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)). A single discriminatory comment by a supervisor or decisionmaker who influenced an adverse employment decision can be sufficient to preclude summary judgment. *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039 (9th Cir. 2005).

Tsur alleges that Jones made ageist comments evidencing discriminatory animus and that Jones influenced the final decisionmaking that resulted in Tsur's layoff. Tsur, however,

---

[4] 29 U.S.C. § 623(a)(1) and (d).

[5] Or. Rev. Stat. (ORS) § 659A.030.

expressly contends that he is not relying on direct evidence but is instead arguing that his evidence is circumstantial and, thus, that *McDonnell Douglas* burden shifting applies. Accordingly, the Court will review Intel's motion under the three-part *McDonnell Douglas* framework.

The *McDonnell Douglas* framework requires that an employee first establish a prima facie case of age discrimination. *Diaz v. Eagle Produce Ltd.*, 521 F.3d 1201, 1207 (9th Cir. 2008). If the employee does so, then "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action." *Id.* If the employer meets that burden, "the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination." *Id.*

To establish a prima facie case of disparate treatment under the ADEA, Tsur must show that he was

> (1) at least forty years old, (2) performing his job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise "giving rise to an inference of age discrimination."

*Id.* at 1207 (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000)). "The requisite degree of proof necessary to establish a prima facie case for Title VII and ADEA claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994). If a plaintiff meets this burden, it "creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).

Similarly, Oregon state law makes it unlawful for an employer to "discriminate against the individual in compensation or in terms, conditions, or privileges of employment," because of

that individual's "race, color, religion, sex, sexual orientation, gender identity, national origin, marital status or age if the individual is 18 years of age or older." ORS § 659A.030(1)(b). The *McDonnell Douglas* burden-shifting framework applies to state age discrimination claims when they are brought in federal court. *See Dawson v. Entek Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011) (concluding that the *McDonnell Douglas* burden-shifting framework is federal procedural law and thus applies to state claims whether the basis of the federal court's jurisdiction over state claims is pendent or diversity).

"[T]he plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quotation marks omitted).

### a. Prima facie case

For purposes of its pending motion for summary judgment, Intel does not dispute the first three elements of Tsur's prima facie case. Intel does, however, dispute the fourth element, that Tsur was discharged under circumstances that give rise to an inference of discrimination.

"An inference of discrimination can be established by showing that the employer had a continuing need for the employees' skills and services in that their various duties were still being performed or by showing that others not in their protected class were treated more favorably." *Diaz*, 521 F.3d at 1207-08 (cleaned up). Employees can use circumstantial evidence to "lead reasonable jurors to draw an inference of age discrimination." *Id.* at 1208. Statistical evidence that a disparity between older and younger workers hired during a certain period, for example, could give rise to an inference of discrimination if that disparity is "so stark as to suggest bias rather than pure chance." *See id.* at 1209. Additionally, "evidence that a group of younger and

comparably or less-qualified employees assumed the plaintiff's responsibilities is sufficient." *Id.* at 1211. Finally, courts in the Ninth Circuit "treat the last [fourth] element of the prima facie case with flexibility." *Id.* (quotation marks omitted).

Intel asserts that Tsur improperly relies on Jones's allegedly offensive age-related statements made in 2011 and 2012. Intel notes that these purported statements are uncorroborated, but argues that even if Jones made these statements, they do not give rise to an inference of age discrimination because they are untimely and were not "tied to" an adverse action. Intel cites *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918-19 (9th Cir. 1996), and *White v. Bolden*, 2017 WL 8793863, at *4 (C.D. Cal. Oct. 18, 2017), to support the latter argument.

Intel's arguments are not persuasive in challenging Tsur's prima facie case for several reasons. First, Tsur does not need corroboration to present this evidence—his assertion that Jones made the statements is sufficient at summary judgment. Second, the statements are not untimely because they are used to show discriminatory motive, which is a proper use for conduct taken (including statements made) outside the limitations period. *See RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1062 (9th Cir. 2002) ("In assessing whether acts occurring within the limitations period are unconstitutional, we may look to pre-limitations period events as evidence of an unconstitutional motive.").

Tsur argues that Intel's layoff, which occurred within the limitations period, was based, at least in part, on the 2013 performance evaluation and SSL5 award given by Jones, and thus his alleged discriminatory motive for those acts is relevant. Jones's 2011 and 2012 comments are relevant to show Jones's purported discriminatory animus. Additionally, as discussed below, Tsur contends that Jones's purported discriminatory motive for Tsur's evaluations and SSL

awards influenced the SSL4 and SSL5 awards later given by Nahas and Rees, which also affected Tsur's eligibility for Intel's layoff.

Third, Intel relies on two cases's discussions of *pretext*, not a plaintiff's *prima facie case*. *Nidds*, 113 F.3d at 918-19 (concluding that the plaintiff sufficiently demonstrated a prima facie case but granting summary judgment because the plaintiff's evidence of pretext was "ambiguous" and not tied to the plaintiff's layoff and therefore was "weak" and insufficient); *White*, 2017 WL 8793863, at *3-4 (explaining that the plaintiff failed to show pretext by offering no direct evidence and other evidence that was "so indirect that it has no bearing whatsoever on his case" and that even though the plaintiff may believe he was treated unfairly due to his age, "a plaintiff's subjective belief is wholly insufficient evidence to establish a claim of discrimination as a matter of law" (quotation marks omitted)). As noted, however, a plaintiff's evidentiary burden is different between the prima facie step and the step that requires a showing of pretext, even through circumstantial evidence.

Unlike the "minimal" burden to show a prima facie case, "[t]o show pretext using circumstantial evidence, in contrast to direct evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1282 (9th Cir. 2017) (quotation marks omitted); *see also Aragon*, 292 F.3d at 659 ("The district court's analysis seems to conflate the minimal inference needed to establish a prima facie case with the specific, substantial showing Aragon must make at the third stage of the *McDonnell Douglas* inquiry to demonstrate that Republic's reasons for laying him off were pretextual."). The Ninth Circuit, however, has "repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." *Dominguez-Curry*, 424 F.3d at 1039. "Where . . . the

PAGE 17 – OPINION AND ORDER

person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision." *Id.* at 1039-40. Thus, evidence of Jones's "discriminatory remarks [may be] sufficient to permit a jury to find that animus affected the ultimate hiring decision, even if [Jones] never communicated his bias to [the final decisionmaker] and even if [the final decisionmaker] was not biased." *Id.* at 1040.

For Tsur's first theory of disparate treatment, based on the cat's paw doctrine, Tsur argues that Jones's discriminatory animus influenced Intel's decision to terminate Tsur's employment because Jones's discriminatory animus caused Tsur to receive a low performance review and low SSL awards that later triggered Tsur's eligibility under Intel's layoff criteria. The evidence is unclear as to what was the precise basis of Tsur's eligibility for Intel's layoff: (a) his 2015 SSL5 award plus his 2013 "Improvement Required" performance evaluation or SSL5 stock award by Jones; or (b) his 2015 SSL5 award plus his 2014 SSL4 award by Nahas. If it was the former, then Jones's alleged discriminatory animus, including Jones's alleged statements in 2011 and 2012, is directly relevant. Even if it was the latter, however, Tsur still raises a genuine issue of material fact regarding the influence of Jones's purported animus on the 2014 and 2015 decisions of Nahas and Rees, as discussed below. Thus, Tsur meets his low burden for showing a prima facie case of age discrimination under a cat's paw theory.

Regarding Tsur's second, and alternative, theory of disparate treatment, that Intel's neutral selection criteria were inherently biased against older workers, the Supreme Court has foreclosed this argument. The Court agrees that Tsur has provided declarations and deposition testimony raising a genuine issue of material fact whether the SSL4 and SSL5 awards, one of the criteria used for the layoffs, were skewed to more senior grade employees. The Supreme Court,

however, rejected disparate treatment ADEA claims when the employer acted "on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 608, 613 (1993). In that case, the Supreme Court explained: "Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.* at 611. "This is true even if the motivating factor is correlated with age, as pension status typically is. Pension plans typically provide that an employee's accrued benefits will become nonforfeitable, or 'vested,' once the employee completes a certain number of years of service with the employer." *Id.*

The Supreme Court allowed that a claim based on a proxy for age might be appropriate if an employer "suppose[s] a correlation between the two factors and act[s] accordingly." *Id.* at 613; *see also id.* at 612-13 (positing that an employer who "targets employees" with a potential status "on the assumption that these employees are likely to be older thereby engages in age discrimination"). Tsur, however, has not argued or provided evidence that Intel knew of or intended any correlation between age and low SSL grant levels or targeted SSL4 and 5 recipients for termination on the assumption that they were older. Thus, even if the larger stock grants were skewed toward more junior level employees who could take advantage of the five-year vesting period, and the smaller stock grants, which were a criterion for the layoffs, tended to skew to older employees, the neutral stock grant factor is not a legally cognizable proxy for age under *Hazen*. To this extent, Intel's motion is granted on Tsur's second theory of disparate treatment, namely that the criteria used by Intel was inherently biased.

Tsur does not contest that Intel has provided a legitimate, nondiscriminatory reason for discharging Tsur. This reason was that Tsur qualified for Intel's 2015 cost-cutting reduction in

force. The layoffs applied to employees throughout Intel who had either (1) a 2015 SSL4 or SSL5 award or low performance evaluation, plus (2) an SSL4 or SSL5 award or a low performance evaluation in the previous three years. The Court thus turns to consider whether Tsur has shown a genuine issue regarding pretext under the *McDonnell Douglas* burden-shifting framework.

### b. Pretext

Tsur may demonstrate pretext "either directly by persuading the court that a discriminatory reason likely motivated [the employer] or indirectly by showing that [the employer's] proffered explanation is unworthy of credence." *Diaz*, 521 F.3d at 1212. To show pretext, Tsur "does not necessarily have to introduce additional, independent evidence of discrimination." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001). Intel argues that Tsur has no evidence that Intel's legitimate, nondiscriminatory business reason for Tsur's layoff is pretextual.

Evidence supporting a cat's paw theory of liability, however, may raise triable issues at the pretext step of the *McDonnell Douglas* framework. *See Poland*, 494 F.3d at 1182-84 (analyzing the cat's paw theory of liability and pretext); *Dominguez-Curry*, 424 F.3d at 1039-40 (analyzing pretext and explaining that one method of creating a triable issue on pretext is evidence of animus through discriminatory comments made by someone who "influenced or participated in the decisionmaking process"). Circumstantial evidence of pretext must be "specific and substantial," but this standard "is tempered by our observation that a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (quotation marks omitted). Further, as previously explained, even a single discriminatory comment may suffice to create a triable issue if made by the plaintiff's supervisor or someone who influenced or participated in the decisionmaking process.

*Dominguez-Curry*, 424 F.3d at 1039-40. "[T]o create a genuine dispute of material fact on pretext, a speaker of discriminatory statements need not be the final decisionmaker of an employment decision." *France*, 795 F.3d at 1176 (applying the cat's paw theory of liability to an ADEA age discrimination claim).

Intel argues that Tsur cannot show that Jones "influenced or was involved in" Tsur's layoff. *Poland*, 494 F.3d at 1182. Intel asserts that Jones provided no input in the layoff selection criteria and that those individuals who did have such input were unaware of Tsur's complaints or Jones's evaluations of Tsur's work performance. Intel also contends that Jones provided no input into Tsur's SSL awards given by Nahas and Rees, which by themselves would have qualified Tsur for layoff under Intel's criteria. Thus, Intel concludes, Tsur cannot prevail on a cat's paw theory of liability.

Tsur, however, does not argue that Jones provided any direct input into Intel's choice of layoff criteria or SSL awards by Nahas and Rees. Rather, Tsur asserts that discriminatory animus motivated Jones to submit poor performance reviews and SSL awards for Tsur, and those, in turn, influenced the performance evaluations and SSL awards given by Nahas and Rees. Viewing the evidence in the light most favorable to Tsur and drawing all reasonable inferences in his favor, the Court finds that Tsur has provided evidence that could persuade a reasonable jury that Jones held discriminatory animus toward Tsur because of Tsur's age. For example, Tsur testified in deposition that Jones told Tsur, "if you think age is an advantage in this job you are mistaken" and "at your [Tsur's] age you should be retired[.]" Tsur also testified that people "around Mr. Jones department [sic] . . . started referring to me as old man, old fart, geezer, and different type of, I think age-demeaning expressions[.]" Tsur also reported in 2012 that Jones had commented to Tsur during their first meeting that Jones had never managed someone ten years

older than Jones and that Tsur did not "match the profile" of Jones's "team." These statements are sufficient to create a genuine dispute as to Jones's discriminatory animus. *See Dominguez-Curry*, 424 F.3d at 1039-40.

The next question is whether Jones influenced the layoff decision. Jones gave Tsur an "Improvement Required" evaluation and a level SSL5 award in 2013. That made Tsur potentially eligible under one prong of the layoff requirement. Because Intel did not investigate Tsur's layoff or provide definitive information as to the specific grounds of his termination, it is unknown what were the precise grounds of Tsur's layoff. If Tsur was laid off in part because of Jones's 2013 performance review or SSL5 award, then Tsur has provided a triable issue regarding whether Jones's purported discriminatory animus caused Tsur's termination.

But even assuming that Tsur's eligibility was solely based on his 2014 SSL4 award from Nahas and his 2015 SSL5 award from Rees, Tsur still provides sufficient evidence to raise a genuine dispute on pretext based on the argument that Nahas and Rees's actions were influenced by Jones's purported discriminatory animus. The declarations and deposition testimony of Nahas, Rees, and Begis explain that SSL awards could not stray too far from the level of the performance evaluations (although the SSL awards were not directly correlated to *performance*, there was a connection to the performance evaluation level) and that current evaluations were influenced by earlier evaluations. This is how Jones's purported discriminatory evaluation can be connected to the later SSL awards.

Nahas explained in his affidavit that his department was forced to take Tsur under a CAP because of Jones, that Tsur completed the CAP "very successfully," and that Tsur behaved "with true grace" throughout what Nahas described as a "superfluous wringer." Nahas also described Jones "as an abrasive bully." Nahas testified in his deposition that he could not give Tsur a

higher than "Successful" rating in 2014 *because* Jones had given Tsur an "Improvement

Required" rating in 2013. According to Nahas, if a manager attempted to give an "Exceeds

Expectations" rating under such circumstances, the manager would be told "you can't jump

[your report] that far up." Nahas added that he believed Tsur had been performing at an "exceeds

expectation" level. Nahas also described in his affidavit that the CAP "required" Tsur to be

"restored" to a "successful" rating, implying that because of the CAP imposed by Jones, Nahas

did not have a choice to rate Tsur any higher than "Successful," which, in turn, affected Tsur's

SSL award.

Nahas also explained in his affidavit that he did not give Tsur the SSL4 award based on

poor performance and stated that "it would be atrocious to consider the given SSL4 stock grant

as any kind of negative performance indicator[.]" During his deposition, Nahas reviewed the

performance criteria of an SSL4 award and explained that Tsur's performance throughout 2013

did not meet that definition. Nahas testified that Tsur's performance "for sure" warranted a

higher award of SSL3. Nahas further explained that his SSL4 award to Tsur was linked to the

"Successful" evaluation and that the SSL awards and performance evaluations "meld[]" together.

Begis also testified at his deposition that the computer program in which a manager inputs the

evaluations and the SSL awards had "encoded intelligence" and would "flag" if the performance

rating and the stock share were "inconsistent"

In his affidavit, Rees similarly explained that Intel's guidance on SSLs provides that an

SSL5 can be awarded solely based on monetary considerations, such as because an employee is

paid high relative to his or her peer group or for purposes of internal equity. Rees confirmed that

he informed Tsur that he was getting the SSL5 to reach better equity within the employment

group. Rees also explained that SSL budgets are strict within each department and that he

believed Intel required its supervisors to award five percent of the awards for the employees under their supervision at the level of SSL5. Rees stated that "had he been able to do what is right, rather than meet an artificial target, Mr. Tsur would have been granted SSL3."

Rees also testified at deposition that supervisors were "guided by management" and that prior performance evaluations of the last three years affect current performance evaluations because employees were not to "ping-pong from low to high then low to high, year after year." In addition, Rees testified that Tsur met the performance standard of an SSL3 award and not of the lower SSL5 award. Rees confirmed that if he could have, he would have given Tsur an award at the level of SSL3.

From this evidence, a reasonable jury could conclude that Jones's purported discriminatory animus and resulting low performance evaluations and SSL awards given by Jones to Tsur detrimentally influenced Nahas and Rees's later performance evaluations and SSL awards for Tsur. There is specific and substantial evidence that Nahas and Rees felt constrained by Jones's 2013 "Improvement Required" rating and award at the SSL5 level to provide Tsur with lower performance evaluations and associated SSL awards than they might otherwise have given to Tsur. These subsequent performance evaluations and SSL awards that Nahas and Rees gave to Tsur may be relevant to how Tsur met Intel's layoff criteria.

For these reasons, Tsur may proceed to trial on his federal and state claims of disparate *treatment* age discrimination.

### 2. Disparate Impact

#### a. Legal Standards

##### i. ADEA

The ADEA "makes it unlawful for an employer to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or

privileges of employment, because of the individual's age." 29 U.S.C. § 623(a)(1). To establish a prima facie case of disparate impact age discrimination in violation of the ADEA, a plaintiff must show "(1) the occurrence of certain outwardly neutral employment practices, and (2) a significantly adverse or disproportionate impact on persons of a particular age produced by the employer's facially neutral acts or practices." *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003). "A disparate impact claim must challenge a *specific* business practice." *Id.* (emphasis added). For example, the Ninth Circuit has found that a reduction in force may constitute a specific employment practice. *Id.*

Under the ADEA, employers may assert as an affirmative defense that the "differentiation [at issue] is based on reasonable factors other than age." 29 U.S.C. § 623(f)(1); *see also Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008). "A reasonable factor other than age is a non-age factor that is objectively reasonable when viewed from the position of a prudent employer mindful of its responsibilities under the ADEA under like circumstances." 29 C.F.R. § 1625.7(e)(1).

### ii. Oregon State Law[6]

The Oregon Court of Appeals has set forth two elements that a plaintiff must satisfy to show employment discrimination claim based on disparate impact: "(1) membership in a class protected by the employment statutes, and (2) that the employer's facially neutral employment rule 'has the effect of screening out members of a protected class at a significantly higher rate

---

[6] The Oregon Supreme Court has not yet decided whether an age discrimination disparate impact claim is available under ORS § 659A.030. *See, e.g.*, *Doyle v. City of Medford*, 256 Or. App. 625, 645-47, 647 n.14, *rev'd in part on other grounds*, 356 Or. 336 (2014) (so noting). The parties, however, do not dispute the availability of such a claim. Thus, the Court assumes without deciding that Tsur may *allege* a disparate impact claim under Oregon law as well as under federal law.

than the others.'" *Tanner v. Or. Health Sciences Univ.*, 157 Or. App. 502, 516 (1998) (quoting *Spurgeon v. Stayton Canning Co.*, 92 Or. App. 566, 570-71 (1988)). The Ninth Circuit has described ORS § 659A.030(1)(a) as "Oregon's parallel age discrimination statute" when analyzing alleged violations of the ADEA and state law. *Enlow*, 389 F.3d at 810. It is well-established that ORS § 659A generally mirrors the federal statutory regime under Title VII and that federal law provides guidance for interpreting Oregon's antidiscrimination law. *See Ossanna*, 365 Or. at 204-05 (stating that Oregon courts "look[] to Title VII precedent for guidance in analyzing claims brought under analogous provisions of ORS chapter 659A"); *Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 711 (2012) (stating that ORS Chapter 659A parallels Title VII); *Henderson v. Jantzen, Inc.*, 79 Or. App. 654, 657 (1986) (adopting the prima facie elements of disparate treatment under Title VII for Oregon Revised Statutes Chapter 659 actions (now renumbered as Chapter 659A)). Thus, decisions in the District of Oregon have analyzed together disparate impact age discrimination claims under the ADEA and ORS § 659A.030. *See, e.g.*, *Pena v. Hous. & Cmty. Serv. Agency of Lane Cnty.*, 2010 WL 3419520, at *10 (D. Or. Aug. 30, 2010); *Adams v. Home Depot USA, Inc.*, 2007 WL 4565163, at *14-15 (D. Or. Dec. 19, 2007).

  **b.  Application**

  Intel argues that summary judgment on Tsur's disparate impact claim should be granted for two alternative reasons. First, Intel contends that Tsur fails to establish a prima facie case of disparate impact because he does not identify a specific employment practice that caused a disparity between older and younger employees.[7] Second, Intel asserts that it has shown that the PMB layoff relied on reasonable factors other than age.

---

  [7] In its motion for summary judgment, Intel also asserts in conclusory terms that Tsur fails to show a causal relationship between any challenged practice and any adverse impact.

### i.  Specific Employment Practice

Intel argues that Tsur does not identify a "specific employment practice," which is

required for a disparate impact claim under the ADEA. *Smith v. City of Jackson*, 544 U.S. 228,

241 (2005). To support this argument, Intel cites the following from Tsur's deposition:

> Q       Okay. Well, so you said that you believed Intel designed
> the PMB criteria to discriminate against older workers?
>
> A       I'm not sure that will be my language. . . . The indications
> here were that if it stands out that there's correlation between age
> and probability of being laid off in a significant way that any
> actions that the company could have taken to alleviate that have
> not been exercised.
>
> Q       And how do you know what the company did?
>
> A       I don't know. I'm looking at the results.

ECF 62-1 at 42-43 (Tsur Dep. 188:10-189:4). Intel argues that Tsur's inability to identify a

particular practice causing a disparate impact on Intel's employees, alongside his apparent

reliance on statistical correlation alone, are fatal deficiencies in his disparate impact claim.

Intel is correct that a plaintiff's reliance on a statistical disparity alone, without pointing

to a defendant's conduct or policy causing that disparity, is fatal to a disparate impact claim. *See*

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656-57 (1989), *superseded by statute on other*

*grounds*, 42 U.S.C. § 2000e-2(k)[8] ("As a general matter, a plaintiff must demonstrate that it is

the application of a specific or particular employment practice that has created the disparate

---

Intel, however, does not develop or support this argument. The Court therefore does not address
it.

[8] The Civil Rights Act of 1991 abrogated *Wards Cove Packing Co.* as to Title VII claims,
but the Supreme Court still applies its burden-shifting standard to other antidiscrimination
statutes. *See S.W. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17
F.4th 950, 960 n.5 (9th Cir. 2021).

impact under attack."); *see also Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542-43 (2015) (same, citing *Wards Cove Packing Co.*). Tsur, however, does identify a specific employment practice that purportedly caused the disparate impact at issue.

The Ninth Circuit has concluded that a reduction in force can be a specific employment practice that supports a disparate impact claim. *See Pottenger*, 329 F.3d at 749. In his response to Intel's motion, Tsur argues that the 2015 reduction in force created a disparate impact by using a methodology that adversely affected older workers. Tsur cites his statistical evidence plus the affidavits and deposition testimony of Nahas, Rees, and Begis, which tend to show that the SSL awards were not performance-based and were directed more to junior grade employees. Tsur points specifically to the inclusion of SSL awards in Intel's 2015 layoff criteria as an employment practice with a disparate impact on older, versus younger, employees. Thus, Tsur does not rely solely on statistical disparity, unlike the plaintiffs in *Wards Cove Packing Company* and *Texas Department of Housing*.

Intel argues that Tsur's deposition testimony, quoted above, constitutes a factual admission that contradicts the basis for his disparate impact claim. Intel's argument is not persuasive. Unlike the deponents in the sources cited in Intel's briefing on this point, Tsur is not trying to "claw back" a factual admission in his deposition testimony by submitting an after-the-fact affidavit to the contrary. *See, e.g.*, *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991). Further, even in *Kennedy*, the Ninth Circuit held that "the district court must make a factual determination that the contradiction was actually a 'sham.'" *Id.* at 267.

The Court does not read Tsur's response at deposition about whether he believed Intel *intentionally* designed discriminatory criteria for the 2015 layoff—itself not a requirement for a

disparate impact claim[9]—as a factual admission that contradicts facts provided *before* his

deposition. The affidavits of Intel's managers were provided before Tsur's deposition, and Tsur

previously articulated his disparate impact theory during the litigation of Tsur's motion to

dismiss.[10] Nor does the fact that Tsur could not articulate the precise legal basis of his disparate

impact claim at the time of his deposition, taken before many of the other depositions and other

discovery provided in this case, render his current legal argument a sham. The Court also does

not find any clear contradiction between Tsur's testimony at deposition and his articulation of his

claim. Indeed, Tsur explained that he was still reviewing the basis of his claim. Intel could have

propounded follow-up interrogatories or other discovery requests if Intel desired a more

definitive description of the basis of Tsur's legal claim on this issue.

Finally, Intel argues that Tsur cannot point to any uneven distribution of Intel's SSL

awards as an employment practice because Intel provided detailed guidance to its managers as to

how they should distribute these awards. This argument is unpersuasive for two reasons. First, it

does not rebut that Tsur *identifies* a specific employment practice of Intel's that Tsur argues

caused unlawful disparity. Rather, Intel's argument goes to the persuasiveness of Tsur's claim,

not whether he meets his prima facie burden. Second, the fact that Intel provided guidance to its

---

[9] *See Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002) ("The rationale, intent or motive underlying a challenged employment practice plays no part in a prima facie case of disparate impact."); *Coleman*, 232 F.3d at 1291 ("Under the disparate impact theory [of the ADEA], employees must prove that a facially neutral employment practice had a discriminatory impact on older workers. *They need not prove motive or intent* . . . " (emphasis added)).

[10] During the oral argument on Intel's motion to dismiss, Tsur, through his counsel, "clarified that his disparate impact claim is based on Intel's methods for selecting employees for the 2015 layoff, which includes its reliance on the RSU policy." ECF 22 at 18 (Opinion and Order on Mot. to Dismiss). The Court reiterated that Tsur's claims for disparate impact "based on the June 2015 layoff" under federal and state law and based on the "RSU stock policy" for state law both survived Intel's motion to dismiss. *Id.* at 18-19.

managers as to the distribution of SSL awards does not prevent Tsur from presenting a genuine

dispute of material fact as to whether it was the general practice or implicit policy to ignore this

guidance, which Tsur argues and provides evidence to support.

### ii. Reasonable Factors Other Than Age

Intel also argues that Tsur's claim of disparate impact fails because Intel has shown that

the 2015 layoff was based on "reasonable factors other than age."[11] Intel asserts that its layoff

criteria—employee performance reviews and SSL awards—were assessments of an employee's

performance by his or her supervisor. Intel argues that performance indicators unrelated to an

employee's age are reasonable criteria for selecting employees to lay off, and thus Intel's

affirmative defense defeats Tsur's disparate impact claim of age discrimination. Intel also

contends that the Supreme Court's decision in *Hazen* forecloses Tsur's argument that the SSL

awards were a proxy for age.

The Court agrees that Intel's employee performance-based criteria can provide a

reasonable factor other than age for an employer's layoff criteria. The question, however, is

whether there is a genuine dispute of material fact about whether Intel's layoff selection criteria

---

[11] At oral argument, Tsur asserted for the first time that Intel did not properly allege this affirmative defense. The Court requested supplemental briefing by Intel on this issue. The Court is satisfied by Intel's response, ECF 84, that it complied with the pleading standards and provided sufficient notice of its affirmative defense. Further, even if it had not, "in the absence of a showing of prejudice an affirmative defense may be raised for the first time at summary judgment." *Garcia v. Salvation Army*, 918 F.3d 997, 1008 (9th Cir. 2019) (cleaned up). Intel's response describes the parties' communications regarding this affirmative defense during discovery and shows that there is no prejudice to Tsur in the Court evaluating the defense on the merits. Further, "[t]here is no prejudice to a plaintiff where an affirmative defense would have been dispositive if asserted when the action was filed." *Id.* (quotation marks omitted). Thus, the Court accepts the pleading of this affirmative defense and considers the merits of Intel's argument.

in fact rested on employee performance, as Intel asserts. The Court finds that there is such a factual dispute.

In their affidavits, the former Intel managers Nahas, Rees, and Begis describe that the SSL award program: (a) had a strict budget that supervisors had to follow; (b) was "an employee retaining device"; (c) had rules designed to "reward lower level employees" at lower salary levels; (d) was intended to increase compensation equity in employee groups; (e) could be based solely on monetary considerations and not performance; and (f) was intended to retain employees through the five-year vesting time frame of the stock awards. The awards, for example, have no value to an employee who will be retiring within five years, before the awards could vest. Given the strict budget constraints on Intel's stock awards, managers were incentivized to give the awards to younger employees for whom they had the most value. In his deposition testimony, Rees testified that the budget guidelines required that higher grade employees (level 7 and above) receive different stock allocations than lower grade employees (level 2-6) and that higher grade employees are "typically" older. Begis similarly explained that the SSL program is designed for retention purposes and that an employee had to "stick around" for the stock award's vesting period to get the benefit from the award. Further, Nahas testified that lower grade employees (level 2-6) were "absolutely" younger than higher grade employees (level 7 and above) and that was the case throughout the entirety of Nahas's employment at Intel.

In addition, Intel's internal guidelines for equity compensation through SSL awards state that "[s]tock is granted to attract, retain, and motivate the employees necessary to enhance Intel's longer-term growth and profitability." Tsur submitted an affidavit by Begis in which he stated that Intel's SSL award system is inherently discriminatory against older employees because an "SSL's value in retaining older employees was diminished or eliminated relative to younger

employees. This was well understood by employees and their managers." A reasonable juror could conclude that because time-vested stock grants are more valuable to younger employees who can stay with Intel longer than older employees, this focus on retention incentivized managers to award stock grants to younger employees.

Also, two of Tsur's former managers testified at deposition and submitted affidavits in which they stated that their SSL awards to Tsur were unrelated to his work performance. Nahas and Rees both repeatedly testified that Tsur performed at a level above the SSL awards they each gave Tsur, that they would have given him a higher SSL award if they could have, and that his SSL award should not be considered a negative performance indicator.

Viewing the facts in the light most favorable to Tsur, as the Court must at this stage of the lawsuit, Tsur has provided enough evidence suggesting that managers at Intel distributed SSL awards with employee retention and equity in mind, rather than solely to reward performance. Tsur also has provided enough evidence to show that more junior level and lower compensated employees tended to receive the larger stock awards and that these employees at Intel were more likely to be younger.

This, however, does not resolve the issue of whether the facially neutral factor of SSL awards "was not a 'factor other than age' but rather an impermissible 'proxy for age.'" *Harris v. Cnty. of Orange*, 902 F.3d 1061, 1073 (9th Cir. 2018). Intel relies on the Supreme Court's decision in *Hazen*, a disparate *treatment* case, to argue that using the SSL awards was not an impermissible proxy for age. The Court, however, finds the Supreme Court's decision in *Smith* to be more analogous.

In *Smith*, the Supreme Court concluded that "the disparate impact is attributable to the City's decision to give raises based on seniority and position. Reliance on seniority and rank is

unquestionably reasonable given the City's goal of raising employees' salaries to match those in surrounding communities." 544 U.S. at 242. The Supreme Court did not reject outright the claim because it was based on seniority, which supports the conclusion that *Hazen* does not automatically bar disparate impact claims when the purported "reasonable factor other than age" is grade or seniority. Instead, a court should conduct a "reasonableness" analysis.

Even viewing the facts in the light most favorable to Tsur, the Court finds that Intel's reliance on performance evaluations and SSL awards as layoff criteria was reasonable as a matter of law. The SSL awards may have had equity and retention as part of their purpose when awarded, rather than simply performance, but an employee retention policy that skews toward one age group can be reasonable. *See Smith*, 544 U.S. at 242 (concluding that providing raises only to more junior employees to match neighboring law enforcement agencies to retain those employees was "unquestionably" reasonable). When it comes to the layoff itself, even if using the SSL awards resulted in some disparity for older employees because the focus of those awards on retention skewed younger, Tsur has failed to present evidence that Intel used the SSL factor as a "proxy" for age, as opposed to a different reasonable factor, considering the Supreme Court's guidance in *Smith* and *Hazen*. *Cf. Doyle v. City of Medford*, 2011 WL 4894077, at *4 (D. Or. Oct. 13, 2011), *aff'd* 512 F. App'x 680 (9th Cir. 2013) (rejecting disparate impact claim based on company purchasing health insurance for active employees but not retirees because it was done for the reasonable factor other than age of saving money, even though excluding retirees necessarily affects older people more). "While there may have been other reasonable ways for [Intel] to achieve its goals, the one selected was not unreasonable. Unlike the business necessity test [applicable in Title VII discrimination cases,] which asks whether there are other

ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement." *Smith*, 544 U.S. at 243.

For these reasons, the Court grants summary judgment against Tsur's federal and state claims of disparate *impact* age discrimination.

## C.  Retaliation

Tsur alleges retaliation for reporting or opposing age discrimination in violation of the ADEA and two different Oregon statutes. The first Oregon statute, ORS § 659A.030(1)(f), prohibits employers from retaliating against employees who oppose or report discrimination. The second Oregon statute, ORS § 659A.199, makes it unlawful for employers to retaliate against whistleblowing employees.

### 1.  ADEA & Oregon Discrimination Law

#### a.  Legal Standards

The ADEA includes an antiretaliation provision that makes it "unlawful for an employer to discriminate against any of [its] employees . . . because such individual . . . has opposed any practice made unlawful by [§ 623 of the ADEA] or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d); *see also Stilwell v. City of Williams*, 831 F.3d 1234, 1240 (9th Cir. 2016). To state a claim for retaliation under the ADEA, a plaintiff must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) his protected activity was the but-for cause of the adverse employment action. *See Stilwell*, 831 F.3d at 1246-47 (discussing how "the ADEA retaliation provision [is] the equivalent of the anti-retaliation provision of Title VII" and that under recent Supreme Court caselaw the protected activity must be the but-for cause of the adverse employment action); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064

(9th Cir. 2002) (stating the elements of a Title VII anti-retaliation claim); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (establishing but-for causation for ADEA discrimination claims).

Regarding the first element, Title VII's anti-retaliation provision and parallel provisions in other statutes, such as the ADEA, protect an employee's opposition to or reporting of unlawful discrimination. "Depending on the circumstances, reports of improper workplace behavior can be protected activity under Title VII." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 962 (9th Cir. 2009). Filing a complaint with the Equal Employment Opportunity Commission is considered a protected activity for Title VII's anti-retaliation provision. *Ray v. Henderson*, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000). "Making an informal complaint to a supervisor is also a protected activity." *Id.*

Tsur also brings a state law age retaliation claim under Oregon's employment discrimination and retaliation statute, ORS § 659A.030(1)(f). "The elements of a prima facie case under ORS § 659A.030(1)(f) are substantially similar" to those for retaliation under Title VII. *Meyer*, 292 Or. App. at 678 (citing *Portland State Univ.*, 352 Or. at 711 ("[F]ederal precedent interpreting the antidiscrimination provisions of Title VII can provide useful additional context to aid our analysis of the meaning of ORS § 659A.030(1)(f).")); *see also Portland State Univ.*, 352 Or. at 712 ("Title VII also contains an antiretaliation provision that is analogous to ORS § 659A.030(1)(f)."). Further, the "relevant provision of the ADEA [is] substantially similar to the antiretaliation prohibition contained in ORS § 659A.030(1)(f) and Title VII." *Id.* at 715 n.12. Accordingly, courts analyze together antiretaliation claims under the ADEA and ORS § 659A.030(1)(f).

### b. Application

Intel argues that the Court should grant summary judgment on Tsur's retaliation claims because Tsur did not engage in any protected activity for which Intel could have retaliated. Intel also asserts that, even if Tsur did engage in protected activity, Tsur cannot establish the requisite causal link between this activity and his layoff. Tsur responds that the protected activity for which Intel retaliated was his April 11, 2012 letter to Evans and later discussions with Thronson from Human Resources. As to causality, Tsur asserts that his reports to Evans and Thronson caused Jones to submit the mid-year "Below Expectations" evaluation. To prove the necessary link, Tsur relies on: (1) the timing of his evaluation, which appears from the record to be close in time to when Thronson spoke with Jones about the investigation; (2) the fact that the evaluation was given outside the normal timing for mid-year evaluations, which Tsur contends were typically given in July; and (3) Jones's failure to give Tsur a written warning before issuing the evaluation, which Tsur asserts was normal practice when giving a "Below Expectations" evaluation. Tsur then relies on his cat's paw theory of causation.

The key question for whether Tsur engaged in protected activity is whether his letter of April 11, 2012 and his discussions with Thronson, alone or in combination, constitute reports or complaints of discrimination. Regarding the letter of April 11, 2012, Tsur reported that Jones stated that he had never managed a person ten years older than himself and that Tsur did not match the profile of Jones's "team" of employees. Although Thronson states in her declaration that Tsur never complained about age discrimination, Thronson admits that she asked Tsur about those comments by Jones, and Tsur testified during his deposition that he told Thronson, "yes, there is age discrimination." Tsur also testified that during that conversation, it "caught [Thronson's] attention" when Tsur discussed Intel's "perception that young people create all the

innovation and that jades people's evaluation of people by age." This is sufficient to create a genuine dispute of material fact whether Tsur engaged in protected conduct.

Regarding causation, Tsur has presented sufficient evidence to defeat summary judgment. The court first reviews whether there is evidence to show a retaliatory motive on the part of Jones for his alleged conduct. Conduct outside the statute of limitations is relevant for purposes of discerning whether Jones had a retaliatory motive. *RK Ventures*, 307 F.3d at 1062. Considering the temporal proximity between when Jones learned about the protected activity and prepared the "Below Expectations" performance evaluation of Tsur on or before September 6, 2012, is sufficient, even by itself, to show retaliatory motive. Although not precisely clear from the record, it appears that Thronson discussed the investigation with Jones "several months" after April 2012, most likely in or around July 2012, and that by September 6, 2012, Jones had a draft of the evaluation prepared. Courts often consider temporal proximity of several months or less enough to support an inference of retaliation on its own. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) (two-and-one-half months); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004) (three months); *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (seven weeks); *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (three, five, and eight months, respectively, all sufficient to support an inference of retaliation); *Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (42 days). The additional evidence—that Jones did not provide notice of the evaluation and gave the evaluation outside the normal mid-year evaluation season—further bolsters Tsur's claimed retaliatory motive for his conduct.

After accepting Jones's retaliatory motive for his "Below Expectations" performance evaluation, his requirement that Tsur be placed on a CAP, receive an "Improvement Required"

performance evaluation, and receive an SSL5 award followed within three months. The Court finds an issue of fact on whether those were also based on retaliatory animus, particularly given Tsur's ongoing reporting of problems with Jones to Thronson during this time period. Although these all occurred outside the statute of limitations, because, as discussed above, Jones's alleged retaliatory animus is alleged to have influenced the adverse employment actions that occurred within the statute of limitations, his alleged retaliatory motive is relevant. For the same reasons the Court found an issue of fact on causation for discrimination under the cat's paw theory, the Court finds an issue of fact on causation for retaliation under this theory. *See Acosta v. Brain*, 910 F.3d 502, 514 (9th Cir. 2018) (affirming denial of summary judgment on retaliation based on the cat's paw theory for causation because the alleged wrongdoer "set in motion a proceeding by an independent decisionmaker that led to an adverse employment action" (cleaned up)).

For these reasons, Tsur may proceed to trial on his claims of retaliation under 29 U.S.C. § 623(d) and ORS § 659A.030(1)(f).

### 2. Oregon Whistleblower Retaliation

To prove whistleblower retaliation under ORS § 659A.199,[12] Tsur must show that Intel discharged, demoted, suspended, or otherwise discriminated or retaliated against Tsur "with regard to promotion, compensation or other terms, conditions or privileges of employment" because Tsur "in good faith reported information that [he] believes is evidence of a violation of a state or federal law, rule or regulation." ORS § 659A.199(1); *see also Hall v. State*, 274 Or. App. 445, 453 (2015) (analyzing the statute's "subjective, good faith" standard). "To prove a

---

[12] Both parties blend Tsur's retaliation claims under ORS §§ 659A.030(1)(f) (employment discrimination retaliation) and 659A.199 (whistleblower retaliation), despite the different standards for these statutory claims. The Court analyzes them separately.

violation [of ORS § 659A.199], a plaintiff must establish a causal link between her complaints about the violation of a law, rule, or regulation, on the one hand, and defendant's adverse employment actions, on the other." *Rohrer v. Oswego Cove, LLC*, 309 Or. App. 489, 497 (2021) (quotation marks omitted); *see also Ossanna v. Nike, Inc.*, 290 Or. App. 16, 28 (2018), *aff'd*, 365 Or. 196 (2019) (interpreting the statute's causation requirement as incorporating "the tort principle of causation by requiring proof that the employee's protected activity was a substantial factor in the employer's adverse decision").

Intel's motion against Tsur's whistleblower retaliation claim fails for the same reason as its motion against Tsur's employment discrimination retaliation claim. Tsur's letter of August 11, 2012 raised the comments by Jones about Tsur's age and not being a match with the "team" and Tsur's subsequent conversation with Thronson confirmed age discrimination and Intel's perception about the value of younger employees that skewed managers' assessments of employees based on age. This is sufficient to create a triable issue as to whether Tsur had a good faith belief that he was raising a complaint or report of a violation of rules, regulations, or laws. The same evidence supporting the ADEA causal link creates a triable issue on causation for this claim.

For these reasons, Tsur may proceed to trial on his claims of whistleblower retaliation under ORS § 659A.199.

## D.  National Origin Discrimination

Intel argues that summary judgment should be granted against Tsur's national origin discrimination claim because Tsur provides no evidence of discriminatory animus from Jones (or anyone else) as to Tsur's national origin. In response, Tsur asserts that Jones's alleged anti-Israeli and antisemitic remarks support an inference that Jones had discriminatory animus

based on Tsur's national origin. The rest of the argument, Tsur contends, mirrors his cat's paw

theory of discrimination from Tsur's age discrimination disparate treatment claim.

Unlike with Tsur's age discrimination claim, for his national origin discrimination claim

Tsur initially provided no evidence that Jones made any such remarks. In his response to Intel's

motion for summary judgment, Tsur asserted that, among other comments, Jones made the

following statements to Tsur:

> • You Israelis have too narrow a view of the world.
>
> • Jews created a lot of problems in this world, look at Socialism.
>
> • Coming from a small country like Israel, do not expect too much
> cooperation from other departments at Intel.
>
> • You Israelis speak too directly with coworkers. This is not a good
> way to conduct business at Intel.
>
> • You need to work at improving your accent.
>
> • I find the same communication problem that I have with you,
> with people who come from China or India.

ECF 68 at 7 (internal page 2) (footnote omitted). Tsur then cited to his deposition at 225:01-

236:20, which he represented were attached as Exhibit 9 to the Declaration of Shanti Lewallen

(ECF 69). *Id*. The only pages from Tsur's deposition that were attached to the Lewallen

declaration, however, were pages 210, 225, 226, and 254. ECF 69 at 104-07.

On December 20, 2022, the day before oral argument, the Court provided counsel with its

Tentative Opinion and Order, noting that Tsur had provided no evidence showing any statements

by Jones reflecting national origin discrimination. Later that evening, Tsur moved for leave to

file a supplemental declaration that contained a corrected version of Exhibit 9 to the Lewallen

Decl. ECF 81. The proposed corrected version of Exhibit 9 included pages 226-36 from Tsur's

deposition, which were cited in the Facts section of Tsur's response to Intel's motion for

summary judgment but inadvertently omitted from Lewallen's declaration based on a "clerical error." ECF 81-1.

All of this was presented to the Court before oral argument on Intel's motion. Because there is no *unfair* prejudice to Intel, the Court granted Tsur's motion for leave to file a supplemental declaration. The Court also allowed Intel to file a supplemental response.

In its supplemental response, Intel argues that the alleged statements regarding "Jews" and Tsur's "accent" are not actionable statements about his national origin. *See, e.g.*, *Mandel v. Bd. of Trustees of California State Univ.*, 2018 WL 5458739, at *7 (N.D. Cal. Oct. 29, 2018) (distinguishing between claims based on race (Jewish) and national origin (Israeli)); *but see EEOC v. AN Luxury Imports of Tucson, Inc.*, 2013 WL 12044519, at *1 (D. Ariz. Dec. 5, 2013) (denying summary judgment on claims based, in part, on allegations that supervisors "mocked" employee's German accent); *Ahuvia v. Wyndham Vacation Resorts, Inc.*, 2013 WL 12407310, at *14 (D. Haw. Nov. 13, 2013) (finding triable issue on race and national origin claims when supervisor mimicked employee's Jewish accent and made comments about how "Jews are greedy and selfish").

In *Espinoza v. Farah Manufacturing Co.*, the Supreme Court recognized that national origin "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." 414 U.S. 86, 88 (1973). "In the federal courts, there is uncertainty about what constitutes race versus national origin discrimination under Title VII." *Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 923 (7th Cir. 2007). This is because "the line between racial and national origin discrimination is difficult to draw and . . . 'the notion of "race" as contrasted with national origin is highly dubious.'" *Id.* (quoting *Ortiz v. Bank of Am.*, 547 F. Supp. 550, 560-62 (E.D. Cal. 1982)).

"The EEOC defines national origin discrimination broadly to include the denial of employment opportunities because of an individual's, or his or her ancestor's, place of origin *or because an individual has the physical, cultural, or linguistic characteristics of a national origin group*." *Id.* (emphasis in original) (citing 29 C.F.R. § 1606.1). Jewish people of Middle-Eastern national origin may qualify as such a group, because the line between race and national origin is blurred.[13] *See id.* (noting that Hispanics qualify as such a group despite coming from different countries because they are being discriminated against "because of their appearance or accent, the very characteristics described in the EEOC regulations"). In the context of a person of Israeli national origin, the Court declines to parse comments that involve both being Israeli and Jewish and exclude comments about being Jewish as unrelated to national origin.

Intel also argues that the comments are merely "stray remarks." The Ninth Circuit, however, applies the "stray remark" doctrine when there are only a few relatively benign remarks. *See Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (holding that a hiring executive's comment that he chose "a bright, intelligent, knowledgeable young man" over the plaintiff was merely a stray remark that could not, without more, establish age discrimination). The Ninth Circuit has rejected applying the stray remark doctrine for even a few statements that show discriminatory animus. *See Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1282 (9th Cir. 2017) (rejecting applying stray remark doctrine based on comments that "a male" would be better as chair of the safety committee and that supervisor did not like "a girl" running freight crew); *Dominguez-Curry*, 424 F.3d at 1038 (rejecting as merely a stray remark alleged comments of supervisor such as "women have no business in construction"); *Cordova v. State Farm Ins.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (rejecting as merely a stray remark when

---

[13] Judaism may also qualify as a protected class based on religion.

supervisor made two statements, including that employee was "a dumb Mexican"). The Court thus declines to find for purposes of summary judgment that Jones's alleged comments were merely stray remarks.

Intel further argues that the alleged comments were unrelated to the decisionmaking process. Tsur, however, is arguing that his supervisor Jones had discriminatory animus based on Tsur's national origin, that Jones gave Tsur low performance ratings and SSL awards based in part on that discriminatory animus, and that those low performance ratings and SSL awards influenced the decionmaking process. Tsur has provided sufficient evidence to survive summary judgment that Jones had discriminatory animus based on national origin. For the same reasons that the Court denied summary judgment on Intel's discrimination claim based on age discrimination, the Court denies Intel's motion for summary judgment against Tsur's national origin discrimination claim under Title VII and Oregon law, based on the "cat's paw" theory.

## CONCLUSION

The Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment (ECF 61). Plaintiff may proceed to trial on his federal and state claims of disparate *treatment* age discrimination (Claim One), retaliation for reporting and/or opposing age discrimination (Claim Three), and disparate treatment national origin discrimination (Claim Four). The Court grants summary judgment in favor of Defendant on Plaintiff's federal and state claim of disparate *impact* age discrimination (Claim Two).

**IT IS SO ORDERED**.

DATED this 29th day of December 2022.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge